# REGIONAL RAIL REORGANIZATION ACT CASES*

Argued October 23, 1974—Decided December 16, 1974

---

*No. 74–165, *Blanchette et al., Trustees of Property of Penn Central Transportation Co.* v. *Connecticut General Insurance Corp. et al.;* No. 74–166, *Smith, Trustee of Property of New York, New Haven & Hartford Railroad Co.* v. *United States et al.;* No. 74–167, *United States Railway Assn.* v. *Connecticut General Insurance Corp. et al.;* and No. 74–168, *United States et al.* v. *Connecticut General Insurance Corp. et al.,* on appeal from the United States District Court for the Eastern District of Pennsylvania.

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 161. STEWART, J., filed a dissenting statement, *post*, p. 161.

*Solicitor General Bork* argued the cause for the United States et al. With him on the briefs were *Assistant Attorney General Hills, Keith A. Jones,* and *Jerome E. Sharfman. Lloyd N. Cutler* argued the cause for the United States Railway Assn. With him on the briefs were *William R. Perlik, William T. Lake,* and *Jordan Jay Hillman. Charles A. Horsky* argued the cause for Blanchette et al., Trustees of the property of Penn Central Transportation Co. With him on the briefs were *Brice M. Clagett* and *Paul R. Duke. Louis A. Craco* argued the cause for Connecticut General Insurance Corp. et al. With him on the briefs were *Frederic L.*

*Ballard, Walter H. Brown, Jr.,* and *Thomas L. Bryan. David Berger* argued the cause and filed briefs for Penn Central Co. *Joseph Auerbach* argued the cause for Smith, Trustee of the property of New York, New Haven and Hartford Railroad Co. With him on the briefs were *James Wm. Moore, Morris Raker,* and *Charles W. Morse, Jr. Brockman Adams* argued the cause and filed a brief for certain United States Representatives as *amici curiae* urging reversal.†

MR. JUSTICE BRENNAN delivered the opinion of the Court.

These direct appeals and the cross-appeal are from a judgment of a three-judge District Court for the Eastern District of Pennsylvania that declared the Regional Rail Reorganization Act of 1973 (Rail Act), 87 Stat. 985, 45 U. S. C. § 701 *et seq.* (1970 ed., Supp. III), unconstitutional in part and enjoined its enforcement.[1] 383 F.

---

†Briefs of *amici curiae* were filed by *Israel Packel,* Attorney General, and *Gordon P. MacDougall,* Special Assistant Attorney General, for the Commonwealth of Pennsylvania; by *David F. Maxwell* for Trustees of Reading Co.; and by *John F. Donelan* for the National Industrial Traffic League.

[1] The judgment was entered in three consolidated cases. One action was brought in the District Court for the Eastern District of Pennsylvania by Connecticut General Insurance Corp. and others against the United States, the United States Railway Association (USRA), and the Secretaries of Treasury and Transportation and the Chairman of the Interstate Commerce Commission in their capacities as incorporators and directors of USRA. A second action was brought in the District Court for the District of Columbia by Penn Central Co., a creditor and the sole stockholder of Penn Central Transportation Co. (Penn Central), now in reorganization under § 77 of the Bankruptcy Act, against the same defendants named in the first action. A third action was brought in the District Court for the District of Columbia by Richard J. Smith, Trustee of the property of the New York, New Haven & Hartford Railroad Co. (New Haven Trustee) against the United States, USRA,

Supp. 510 (1974). We noted probable jurisdiction, *post,* p. 801. We reverse.

# I

## *Introduction*

A rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country [2] entered reorganization proceedings under § 77 of the Bankruptcy Act, 11 U. S. C. § 205.[3] After interim meas-

---

and the Secretary of Transportation. Three-judge courts were convened in each suit but, by consent of the parties, the second and third actions were transferred to the Eastern District and consolidated for disposition before the three-judge court convened in that action. The Trustees of Penn Central intervened.

Three direct appeals and one cross-appeal from the District Court's judgment were consolidated for decision in this Court. No. 74–165 is the appeal of the Trustees of Penn Central; No. 76–167 is the appeal of USRA; No. 74–168 is the appeal of the United States; and No. 74–166 is the cross-appeal of the New Haven Trustee.

[2] The Rail Act defines "Region" as the "States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, Ohio, Indiana, Michigan, and Illinois; the District of Columbia; and those portions of contiguous States in which are located rail properties owned or operated by railroads doing business primarily in the aforementioned jurisdictions (as determined by the [Interstate Commerce] Commission by order)." § 102 (13), 45 U. S. C. § 702 (13) (1970 ed., Supp. III). ICC Order *Ex parte* No. 293, approved January 14, 1974, delineated areas near Louisville, Ky.; St. Louis, Mo.; and Kewaunee and Manitowoc, Wis., as included in the Region. 39 Fed. Reg. 3605 (1974).

[3] In addition to Penn Central, the railroads are the Reading (*In re Reading Co.,* Bky. No. 71–828, ED Pa.), Erie Lackawanna (*In re Erie Lackawanna R. Co.,* No. B72–2838, ND Ohio), Central of New Jersey (*In re Central R. Co. of New Jersey,* No. B401–67, N. J.), Lehigh Valley (*In re Lehigh Valley R. Co.,* Bky. No. 70–432, ED Pa.), Boston & Maine (*In re Boston & Maine Corp.,* Bky. No. 70–250–M, Mass.), Ann Arbor (*In re Ann Arbor R. Co.,* Bky. No.

ures proved to be insufficient,[4] Congress concluded that solution of the crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation. Since such a system cannot be created under § 77 rail reorganization law, and since significant federal financing would be necessary to make such a plan workable, Congress supplemented § 77 with the Rail Act, which became effective on January 2, 1974. The salient features of the Rail Act are:

1. Reorganization of each railroad in § 77 reorganization must proceed pursuant to the Rail Act unless the district court having jurisdiction over its reorganization (a) finds, within 120 days after January 2, 1974, "that the railroad is reorganizable on an income basis within a reasonable time under section [77] and that the public interest would be better served by such a reorganization

---

74-90833, ED Mich.), and the Lehigh & Hudson River (*In re Lehigh & Hudson River R. Co.,* No. 72-B-419, SDNY).

The following lessors of leased lines of Penn Central also filed § 77 petitions in the District Court for the Eastern District of Pennsylvania in Bky. No. 70-347: United New Jersey Railroad & Canal Co.; Beech Creek Railroad Co.; Cleveland, Cincinnati, Chicago & St. Louis Railway Co.; Cleveland & Pittsburgh Railroad Co.; Connecting Railway Co.; Delaware Railroad Co.; Erie & Pittsburgh Railroad Co.; Michigan Central Railroad Co.; Northern Central Railway Co.; Penndel Co.; Philadelphia, Baltimore & Washington Railroad Co.; Philadelphia & Trenton Railroad Co.; Pittsburgh, Youngstown & Ashtabula Railway Co.; Pittsburgh, Fort Wayne & Chicago Railway Co.; and Union Railroad Co. of Baltimore.

[4] These included the Emergency Rail Services Act of 1970, 84 Stat. 1975, 45 U. S. C. § 661 *et seq.,* which authorized the Secretary of Transportation to guarantee up to $125 million in certificates issued by trustees of railroads in reorganization if he found, *inter alia,* that there was a threat of imminent cessation of essential rail services and that the only practicable means of meeting expenses necessary to continue such services was the issuance of such guaranteed certificates.

than by a reorganization under this chapter," [5] or (b) within 180 days after January 2, 1974, "finds that this chapter does not provide a process which would be fair and equitable to the estate of the railroad in reorganization . . . ." § 207 (b), 45 U. S. C. § 717 (b) (1970 ed., Supp. III).[6] Appeals from § 207 (b) orders may be taken within 10 days of entry to a Special Court constituted under § 209 (b), 45 U. S. C. § 719 (b) (1970 ed., Supp. III), and must be decided by the Special Court within 80 days after the appeal is taken. Section 207 (b) expressly provides that "[t]here shall be no review of the decision of the special court." [7]

---

[5] The Erie Lackawanna and Boston & Maine reorganization courts each determined that its railroad is reorganizable on an income basis within a reasonable time; reorganization of those railroads will not proceed under the Rail Act. *In re Erie Lackawanna R. Co.*, —— F. Supp. —— (ND Ohio 1974); *In re Boston & Maine Corp.*, 378 F. Supp. 68 (Mass. 1974).

[6] Three reorganization courts found that the Rail Act does not provide a process that is fair and equitable to the estates of the railroads under their jurisdiction. *In re Penn Central Trans. Co.*, 382 F. Supp. 856 (ED Pa. 1974); *In re Lehigh Valley R. Co.*, 382 F. Supp. 854 (ED Pa. 1974); *In re Penn Central Trans. Co. (Secondary Debtors)*, 382 F. Supp. 821 (ED Pa. 1974); *In re Central R. Co. of New Jersey*, —— F. Supp. —— (NJ 1974); *In re Lehigh & Hudson River R. Co.*, 377 F. Supp. 475 (SDNY 1974). The Special Court established under § 209 (b), see n. 7, *infra*, on September 30, 1974, reversed the orders in those cases and directed reorganization under the Rail Act, 384 F. Supp. 895.

Two other reorganization courts held that the Rail Act does provide a fair and equitable process and ordered that reorganization proceed under the Rail Act. *In re Reading Co.*, 378 F. Supp. 481 (ED Pa. 1974); *In re Ann Arbor R. Co.*, —— F. Supp. —— (ED Mich. 1974).

[7] Section 209 (b) provides in pertinent part:

"Within 30 days after January 2, 1974, [USRA] shall make application to the judicial panel on multi-district litigation authorized by section 1407 of Title 28 for the consolidation

2. Appellant United States Railway Association (USRA) is established as a new Government corporation. § 201 (a), 45 U. S. C. § 711 (a) (1970 ed., Supp. III). USRA must prepare a "Final System Plan" for restructuring the railroads in reorganization into a "financially self-sustaining rail service system." § 206 (a)(1), 45 U. S. C. § 716 (a)(1) (1970 ed., Supp. III). See §§ 201, 202, 204–206, 45 U. S. C. §§ 711, 712, 714–716 (1970 ed., Supp. III). The Final System Plan must provide for transfer of designated rail properties by the railroads in reorganization to a private state-incorporated corporation, Consolidated Rail Corporation (Conrail), § 301 (a), 45 U. S. C. § 741 (a) (1970 ed., Supp. III), in return for securities of Conrail, plus up to $500 million of USRA obligations guaranteed by the United States, and "the other benefits accruing to such railroad by reason of such transfer." § 206 (d)(1), 45 U. S. C. § 716 (d)(1) (1970 ed., Supp. III); see also § 210, 45 U. S. C. § 720 (1970 ed., Supp. III).[8]

---

in a single, three-judge district court of the United States of all judicial proceedings with respect to the final system plan. . . . Such proceedings shall be conducted by the special court which shall be composed of three Federal judges who shall be selected by the panel . . . . The special court is authorized to exercise the powers of a district judge in any judicial district with respect to such proceedings and such powers shall include those of a reorganization court. The special court shall have the power to order the conveyance of rail properties of railroads leased, operated, or controlled by a railroad in reorganization in the region. . . ."

The Judicial Panel on Multidistrict Litigation selected Circuit Judge Henry J. Friendly, Circuit Judge Carl McGowan, and District Judge Roszel C. Thomsen to compose the Special Court.

[8] Section 206 (c) provides as follows for the designation of rail properties for the Final System Plan:

"(c) Designations.

"The final system plan shall designate—

"(1) which rail properties of railroads in reorganization in the

3. USRA must submit a proposed Final System Plan to Congress within 570 days after January 2, 1974, §§ 207 (c), 207 (d), 208 (a), 45 U. S. C. §§ 717 (c), 717 (d), 718

region or of railroads leased, operated, or controlled by any railroad in reorganization in the region—

"(A) shall be transferred to [Conrail];

"(B) shall be offered for sale to a profitable railroad operating in the region and, if such offer is accepted, operated by such railroad; the plan shall designate what additions shall be made to the designation under subparagraph (A) of this paragraph in the event such profitable railroad fails to accept such offer;

"(C) shall be purchased, leased, or otherwise acquired from [Conrail] by the National Railroad Passenger Corporation . . . ;

"(D) may be purchased or leased from [Conrail] by a State or a local or regional transportation authority to meet the needs of commuter and intercity rail passenger service; and

"(E) if not otherwise required to be operated by [Conrail], a government entity, or a responsible person, are suitable for use for other public purposes, including highways, other forms of transportation, conservation, energy transmission, education or health care facilities, or recreation . . . ; and

"(2) which rail properties of profitable railroads operating in the region may be offered for sale to [Conrail] or to other profitable railroads operating in the region subject to paragraphs (3) and (4) of subsection (d) of this section."

Section 206 (d) provides as follows respecting transfers to Conrail:

"(d) Transfers.

"All transfers or conveyances pursuant to the final system plan shall be made in accordance with, and subject to, the following principles:

"(1) All rail properties to be transferred to [Conrail] by a profitable railroad, by trustees of a railroad in reorganization, or by any railroad leased, operated, or controlled by a railroad in reorganization in the region, shall be transferred in exchange for stock and other securities of [Conrail] (including obligations of [USRA]) and the other benefits accruing to such railroad by reason of such transfer."

Sections 210 (b), 213, 214, and 215 provide as respects federal funds as follows:

"(b) Maximum obligational authority.

"Except as otherwise provided in the last sentence of this subsec-

(a) (1970 ed., Supp. III), that is, by July 26, 1975.[9] The Plan becomes "effective" if neither House of Congress disapproves it within 60 continuous session days

tion, the aggregate amount of obligations of [USRA] issued under this section which may be outstanding at any one time shall not exceed $1,500,000,000 of which the aggregate amount issued to [Conrail] shall not exceed $1,000,000,000. Of the aggregate amount of obligations issued to [Conrail] by [USRA], not less than $500,000,-000 shall be available solely for the rehabilitation and modernization of rail properties acquired by [Conrail] under this chapter and not disposed of by [Conrail] pursuant to section 716 (c)(1)(C) of this title. Any modification to the limitations set forth in this subsection shall be made by joint resolution adopted by the Congress." § 210, 45 U. S. C. § 720 (1970 ed., Supp. III).

.        .        .        .        .

"(a) Emergency assistance.

"The Secretary is authorized, pending the implementation of the final system plan, to pay to the trustees of railroads in reorganization such sums as are necessary for the continued provision of essential transportation services by such railroads. Such payments shall be made by the Secretary upon such reasonable terms and conditions as the Secretary establishes, except that recipients must agree to maintain and provide service at a level no less than that in effect on January 2, 1974.

"(b) Authorization for appropriations.

"There are authorized to be appropriated to the Secretary for carrying out this section such sums as are necessary, not to exceed $85,000,000, to remain available until expended." § 213, 45 U. S. C. § 723 (1970 ed., Supp. III).

.        .        .        .        .

"(a) Secretary [of Transportation].

"There are authorized to be appropriated to the Secretary for purposes of preparing the reports and exercising other functions to be performed by him under this chapter such sums as are necessary, not to exceed $12,500,000, to remain available until expended.

"(b) Office.

"There are authorized to be appropriated to the [Interstate Commerce] Commission for the use of the Office in carrying out its func-

after submission. §§ 102 (4), 208 (a), 45 U. S. C. §§ 702 (4), 718 (a) (1970 ed., Supp. III).[10] USRA is required to transmit the Plan within 90 days after its effective

tions under this chapter such sums as are necessary, not to exceed $5,000,000, to remain available until expended. . . .

"(c) Association.

"There are authorized to be appropriated to [USRA] for purposes of carrying out its administrative expenses under this chapter such sums as are necessary, not to exceed $26,000,000, to remain available until expended." § 214, 45 U. S. C. § 724 (1970 ed., Supp. III).

.        .        .        .        .

"Prior to the date upon which rail properties are conveyed to [Conrail] under this chapter, the Secretary, with the approval of [USRA], is authorized to enter into agreements with railroads in reorganization in the region (or railroads leased, operated, or controlled by railroads in reorganization) for the acquisition, maintenance, or improvement of railroad facilities and equipment necessary to improve property that will be in the final system plan. Agreements entered into pursuant to this section shall specifically identify the type and quality of improvements to be made pursuant to such agreements. Notwithstanding section 720 (b) of this title, [USRA] shall issue obligations under section 720 (a) of this title in an amount sufficient to finance such agreements and shall require [Conrail] to assume any such obligations. However, [USRA] may not issue obligations under this section in an aggregate amount in excess of $150,000,000. . . ." § 215, 45 U. S. C. § 725 (1970 ed., Supp. III).

[9] The period of 450 days provided by § 207 (c) was extended 120 days by Pub. L. 93–488, 88 Stat. 1465, effective Oct. 26, 1974.

[10] Concerning congressional review of the Final System Plan, § 208 provides:

"(a) General.

"The Board of Directors of [USRA] shall deliver the final system plan adopted by [USRA] to both Houses of Congress and to the Committee on Interstate and Foreign Commerce of the House of Representatives and the Committee on Commerce of the Senate. The final system plan shall be deemed approved at the end of the first period of 60 calendar days of continuous session of Congress after such date of transmittal unless either the House of Representa-

date to the Special Court which, under § 209 (b), is given exclusive jurisdiction of all "proceedings with respect to the final system plan." 45 U. S. C. § 719 (b) (1970 ed., Supp. III). The Special Court "within 10 days after deposit . . . of" Conrail securities and USRA obligations "shall . . . order the trustee or trustees of each railroad in reorganization . . . to convey forthwith" to Conrail "all right, title, and interest in the rail properties of such railroad in reorganization . . ." designated in the Final System Plan. § 303 (b), 45 U. S. C. § 743 (b) (1970 ed., Supp. III).

4. The Special Court next determines whether the conveyances of the rail properties to Conrail "(A) . . . are in the public interest and are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization . . . under section [77] . . . [or] (B) whether the transfers or conveyances are more fair and equitable than is required as a constitutional minimum." § 303 (c), 45 U. S. C. § 743 (c)

tives or the Senate passes a resolution during such period stating that it does not favor the final system plan.

"(b) Revised plan.

"If either the House or the Senate passes a resolution of disapproval under subsection (a) of this section, [USRA], with the cooperation and assistance of the Secretary and the Office, shall prepare, determine, and adopt a revised final system plan. Each such revised plan shall be submitted to Congress for review pursuant to subsection (a) of this section.

"(c) Computation.

"For purposes of this section—

"(1) continuity of session of Congress is broken only by an adjournment sine die; and

"(2) the days on which either House is not in session because of an adjournment of more than 3 days to a day certain are excluded in the computation of the 60-day period." § 208, 45 U. S. C. § 718 (1970 ed., Supp. III).

(1970 ed., Supp. III). If the Special Court finds that the transfer is not fair and equitable, the Special Court must reallocate, or order issuance of additional, Conrail securities and USRA obligations (subject to the overall $500 million limitation on USRA obligations for this purpose), or enter a judgment against Conrail, or decree a combination of these remedies. § 303 (c)(2). The Special Court is not authorized to enter a judgment against the United States. Section 303 provides also that if the Special Court decides that the consideration exchanged for the rail properties is "more fair and equitable than is required as a constitutional minimum," § 303 (c)(1)(B), it shall make necessary adjustments so that the "constitutional minimum" is not exceeded. § 303 (c)(3). Appeal from § 303 (c) determinations is to this Court. § 303 (d).[11]

5. Although railroads in reorganization subject to the Act are free to abandon service and dispose as they wish of any rail properties not designated for transfer under the Final System Plan, §§ 304 (a)–(c), 45 U. S. C. §§ 744

---

[11] Section 303 (d) provides:

"(d) Appeal.

"A finding or determination entered pursuant to subsection (c) of this section may be appealed directly to the Supreme Court of the United States in the same manner that an injunction order may be appealed under section 1253 of Title 28: *Provided,* That such appeal is exclusive and shall be filed in the Supreme Court not more than 5 days after such finding or determination is entered by the special court. The Supreme Court shall dismiss any such appeal within 7 days after the entry of such an appeal if it determines that such an appeal would not be in the interest of an expeditious conclusion of the proceedings and shall grant the highest priority to the determination of any such appeals which it determines not to dismiss."

We are not required to consider in this case the validity of this attempted congressional regulation of the Court's disposition of any appeal from a judgment entered by the Special Court pursuant to subsection (c).

(a)–(c) (1970 ed., Supp. III), until that Plan becomes effective none "may discontinue service or abandon any line of railroad . . . unless . . . authorized to do so by [USRA] and unless no affected State or local or regional transportation authority reasonably opposes such action . . . ." § 304 (f).

## II

### Proceedings in the District Court

Constitutional questions concerning the Act are raised in this litigation by parties with interests in the Penn Central Transportation Co. (Penn Central), the largest of the eight railroads in reorganization.[12]  The principal

---

[12] The suits here were brought by the major creditors and sole shareholder of Penn Central. Penn Central was the product of the merger of the Pennsylvania Railroad with the New York Central Railroad. *Penn-Central Merger Cases,* 389 U. S. 486 (1968). A condition of that merger was Penn Central's promise to take in the New York, New Haven & Hartford Railroad Co. as an operating entity, and that promise was fulfilled. *New Haven Inclusion Cases,* 399 U. S. 392 (1970).

The Penn Central operation dominates the northeast-midwest region. It serves 55% of the Nation's manufacturing plants employing 60% of the country's industrial employees. More than 20% of all freight cars loaded in the United States pass over Penn Central's 20,000 miles of track, and over 70% of Penn Central traffic involves other railroads. Rail Service in the Midwest and Northeast Region, 39 Fed. Reg. 5392, 5401 (1974); H. R. Rep. No. 93–620, p. 26 (1973) (hereinafter H. Rep.). Since 1973 Penn Central (including its leased lines) accounted for 94% of the operating mileage and 87% of the operating revenues of the six bankrupt railroads involved under the Rail Act. The merger failed to realize anticipated savings and Penn Central entered reorganization proceedings in 1970, two years after the merger was approved. Huge operating losses made reorganization inevitable and have continued. The Financial Collapse of the Penn Central Company, SEC Staff Report 86 (1972). The Penn Central Trustees in a Report of February 10, 1971, Concerning Premises for A Reorganization, Joint Documentary Submission No. 1, concluded that the

contention of the plaintiffs in the District Court was that the Rail Act in two respects effects a taking of rail properties of Penn Central without payment of just compensation, in violation of the Fifth Amendment. They contended, first, that the Conrail securities and USRA obligations and other benefits to be received would not be the constitutionally required equivalent of the rail properties compelled by § 303 (b) to be transferred. This is the "conveyance taking" issue. This claim was rejected by the District Court as premature. 383 F. Supp., at 517–518. They contended, second, that a taking of their property without just compensation will result from the severe inhibitions imposed upon discontinuance of service and abandonment of lines. In particular, they claimed that § 304 (f) compels continuation of rail operations pending implementation of the Final System Plan even if erosion of the Penn Central estate beyond constitutional limits occurs during this period. This is the "erosion taking" issue. The District Court agreed that § 304 (f) required continued operations to this extent, and viewed the huge operating losses already incurred by Penn Central as making this contention ripe for determination, saying:

> "[W]e are persuaded that a significant possibility exists that a point of erosion either has been or may soon be reached so that it can be said that [the contention of plaintiffs below] of interim unconstitu-

---

"overriding problem of Penn Central . . . is found in an obligation to perform as a public service company in certain areas and under certain conditions which simply do not lend themselves to profitable operations, no matter who the operator is, or how efficient. The only possible remedy here is for public authority to lend its hand to a speedy elimination of the conditions which produce the losses, or respond with adequate compensation if it insists upon a continuance of the conditions."

tional taking by continued loss operations is ripe for adjudication." 383 F. Supp., at 525.

The District Court rejected the argument of the United States, USRA, and the Penn Central Trustees that if in fact the constitutional limit of permissible uncompensated erosion should be passed, plaintiffs would have an adequate remedy at law in the Court of Claims under the Tucker Act, 28 U. S. C. § 1491. The District Court construed the Rail Act as precluding a Tucker Act remedy, stating:

"We are persuaded that the legislative history supports the conclusion that Congress intended that financial obligations be limited to the express terms of the Act. Article I, Section 9, Clause 7 [of the Constitution] provides that no money shall be drawn from the Treasury of the United States except in consequence of an appropriation made by law. Section 213 (b) [of the Rail Act], and section 214 entitled 'Authorization for Appropriations' place an express ceiling on expenditures. Section 210 describes the maximum obligational authority of [USRA], and the authorization for appropriation is limited to 'such amounts as are necessary to discharge the obligations of the United States arising *under this section.*' (Emphasis supplied.) Judicial review is delineated with specificity in Sections 209 (a) and 303 with no mention of the Court of Claims." 383 F. Supp., at 528–529.

The District Court therefore declared § 304 (f) governing interim abandonments

"null and void as violative of the Fifth Amendment of the United States Constitution, to the extent that it would require continued operation of rail services at a loss in violation of the constitutional rights of the owners and creditors of a railroad."

It consequently enjoined defendants below

"from taking any action to enforce the provisions of Section 304 (f) ... with respect to any abandonment, cessation, or reduction of service which has been or may hereafter be determined by a court of competent jurisdiction to be necessary for the preservation of rights guaranteed by the United States Constitution."

The District Court also declared that § 303 relating to the final conveyance of rail properties pursuant to the Final System Plan is

"null and void as contravening the Fifth Amendment . . . insofar as it fails to provide compensation for interim erosion pending final implementation of the Final System Plan . . . ."

Finally, the District Court enjoined USRA "from certifying a Final System Plan to the Special Court pursuant to Section 209 (c)." 383 F. Supp., at 530.

The Rail Act was also challenged in the District Court as not "uniform" within the requirement of Art. I, § 8, cl. 4, of the Constitution, which provides that Congress shall have the power to enact "uniform Laws on the subject of Bankruptcies throughout the United States." The District Court dismissed this contention as without merit except as to one provision of § 207 (b). The section provides that if any reorganization court determines in the 180-day proceedings under § 207 (b) that the Act does not provide a fair and equitable process for the reorganization of a debtor, the debtor shall not be reorganized pursuant to the Act, and the reorganization court "shall dismiss the reorganization proceeding." The District Court declared this part of § 207 (b) "null and void, as violative of Article I, Section 8, Clause 4 . . . ," [13] and en-

---

[13] For reasons stated in Part VI of this opinion, *infra,* we have no occasion to pass upon the correctness of this conclusion.

joined "all parties . . . from enforcing, or taking any action to implement, so much of Section 207 (b) . . . as purports to require dismissal of pending proceedings for reorganization under Section 77 of the Bankruptcy Act."

## III

### *The Issues for Decision*

The major issues dividing the parties are (1) whether an action at law in the Court of Claims under the Tucker Act, 28 U. S. C. § 1491, will be available to recover any deficiency of constitutional dimension in the compensation provided under the Rail Act for either the alleged "erosion taking" or the alleged "conveyance taking," and (2) if the Tucker Act remedy is available, whether it is an adequate remedy. The United States, USRA, and the Penn Central Trustees contend that if resort to a supplemental remedy under the Tucker Act is necessary, it is both available and adequate. The plaintiffs below contend that the Rail Act precludes resort to the Tucker Act remedy, and if it does not, that the remedy is inadequate.

The Special Court, speaking through Judge Friendly, comprehensively canvassed both issues, and in a thorough opinion, concluded that the Rail Act does not bar any necessary resort to the Tucker Act remedy and that the remedy is adequate. Our independent examination of the issues brings us to the same conclusion, substantially for the reasons stated by Judge Friendly in Parts VII and VIII–A of the Special Court opinion. 384 F. Supp. 895, 938–951 (1974).[14]

---

[14] Part VIII–B of the Special Court opinion considers the arguments of investors of several of the smaller lines. But those investors are not parties to the cases before us.

Part VIII–C of the Special Court's opinion discusses the question whether the Court of Claims is free to deny the existence of the

Also disputed is the District Court's ruling on the uniformity of the Rail Act under the Bankruptcy Clause. We hold that the currently operable portions of the Act are uniform.

## IV

### A

#### *The Alleged "Erosion Taking"*

In its opening brief, the United States, speaking for all federal parties except USRA, argued that the case involved no "erosion taking" because, as a matter of law, compelled-loss operations pending implementation of the Final System Plan would not constitute a taking of the property of the claimants against the bankrupt railroad estates. The argument was that the general rule that if the railroad "be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss," *Brooks-Scanlon Co.* v. *Railroad Comm'n of Louisiana,* 251 U. S. 396, 399 (1920); see also *Bullock* v. *Florida ex rel. Railroad Comm'n,* 254 U. S. 513 (1921); *Railroad Comm'n of Texas* v. *Eastern Texas R. Co.,* 264 U. S. 79 (1924), is qualified by the requirement that a railroad estate suffer interim losses for a reasonable period pending good-faith efforts to develop a feasible reorganization plan if the public interest in continued

---

Tucker Act remedy if its existence should be challenged before the Court of Claims. The fact that the District Court below concluded, contrary to the Special Court, that the Tucker Act remedy was not available was viewed as making the question a "puzzlement." 384 F. Supp., at 954. In consequence, the Special Court stayed its order remanding the Penn Central and four other cases for the entry of orders in the reorganization courts and affirming the orders directing that the Reading and Ann Arbor reorganizations proceed under the Rail Act until "after final determination by the Supreme Court" of the instant appeals. *Id.,* at 955.

rail service justifies the requirement. *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648, 677 (1935); see also *RFC* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495, 535–536 (1946); *New Haven Inclusion Cases,* 399 U. S. 392, 493 (1970). The United States maintained that the Rail Act represented just such a good-faith effort. In its Reply Brief 3–4, however, it abandoned the position that the Final System Plan was sure to be implemented within a reasonable period:

> "Difficulties now unforeseen and unanticipated could in fact delay final implementation of the final system plan. For example, Congress could, in theory, successively disapprove several proposed final system plans. Thus, whatever the probabilities, the parties and this Court have no absolute assurance that the plan will in fact be implemented within a reasonable time. For that reason, we have determined that a taking of property through interim erosion, although extremely unlikely, remains a theoretical possibility under the Rail Act.

> "Accordingly, we believe that an injunction preventing [USRA] from denying applications for discontinuance of service under Section 304 (f) in those circumstances might be appropriate unless, as we contend, a remedy for any otherwise uncompensated taking will be available under the Tucker Act. We are therefore persuaded that this Court must reach and decide the 'Tucker Act question' presented by these appeals." (Footnote omitted.)

We conclude in any event that the availability of a Tucker Act remedy if the Rail Act effects an "erosion taking" is ripe for adjudication. It is true that there has been no definitive determination that erosion of the Penn Central estate has reached unconstitutional dimen-

sions—that is, that the estate has suffered losses unreasonable even in light of the public interest in continued rail service pending reorganization. But the Penn Central Reorganization Court found that Penn Central is not "reorganizable on an income basis within a reasonable time under § 77 of the Bankruptcy Act." 382 F. Supp. 831, 842 (ED Pa. 1974). And it was stipulated in the District Court that Penn Central sustained ordinary net losses from mid-1970 through 1973 aggregating approximately $851 million, and that in the two months following enactment of the Rail Act on January 2, 1974, Penn Central had deficits in net railway operating income, total income, net income, and income available for fixed charges. It is therefore reasonable to conclude that compelled continued rail operations under these conditions pending implementation of the Final System Plan may accelerate erosion of the interests of plaintiffs below through accrual of post-bankruptcy claims having priority over their claims. Thus, failure to decide the availability of the Tucker Act would raise the distinct possibility that those plaintiffs would suffer an "erosion taking" without adequate assurance that compensation will ever be provided.[15] Yet there must be at the time of

---

[15] The severely limited funds available pursuant to §§ 213 and 215 for emergency assistance and plant maintenance pending implementation of the Final System Plan do not assure that adequate compensation will be available for any "erosion taking." Section 213 provides $85 million in emergency grants for continued essential transportation services while § 215 provides $150 million in USRA obligations for maintenance and improvement of plant.

Nor is adequate assurance provided by the possibility that Conrail securities and other benefits can be provided for unconstitutional erosion when the Special Court determines the proper consideration for the rail properties conveyed to Conrail. As the Special Court itself found:

"The Government parties [contend] that . . . this court could compensate for any unconstitutional erosion in the final system

taking "reasonable, certain and adequate provision for obtaining compensation." *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 659 (1890); see also *Joslin Mfg. Co.* v. *City of Providence*, 262 U. S. 668, 677 (1923); *United States* v. *Dow*, 357 U. S. 17, 21 (1958). Therefore we must determine if the Tucker Act is available.

## B

*Availability of the Tucker Act Remedy for Any "Erosion Taking"*

The Tucker Act, 28 U. S. C. § 1491, provides in pertinent part:

"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract

---

plan, either by fixing a valuation date prior to the date of conveyance or by a specific award, § 303 (c)(2)(B), or a deficiency judgment against Conrail under § 303 (c)(2)(C). The earlier valuation date method would hardly be satisfactory even if permissible, [*] since this would not cure erosion with respect to rail properties that were not conveyed. It would be permissible for the final system plan to provide or for us to direct that compensation for erosion should be made in the case of any railroad some of whose properties are conveyed. However, if, as the opponents urge, the consideration now authorized is inadequate as compensation for the properties themselves, enlarging the amount of claims that may be made against it would be of no avail." 384 F. Supp., at 925–926.

"[*] The House version of the Act, as explained by the report accompanying it, provided that '[t]he value of consideration must equal the fair and equitable value of the rail properties as of the date of the conveyance.' House Report at 53. However, the Act contains no such limitation and the Conference Report, H. R. Rep. No. 93–774, 93d Cong., 1st Sess. (1973), makes no mention of the deletion."

with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

A claim founded upon a taking of property for public use by operation of the Rail Act without just compensation in violation of the Fifth Amendment plainly would fall within the literal words of "any claim against the United States founded . . . upon the Constitution . . . ." The District Court, however, inquired whether the Rail Act affirmatively provided the Tucker Act remedy, and held that to "read a Tucker Act remedy into the [Rail] Act" would be "judicial legislation on a grand, if not arrogant, scale." 383 F. Supp., at 529.

The District Court made the wrong inquiry. The question is not whether the Rail Act expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy. Rather, it is whether Congress has in the Rail Act *withdrawn* the Tucker Act grant of jurisdiction to the Court of Claims to hear a suit involving the Rail Act "founded . . . upon the Constitution." For we agree with the Special Court that

> "the true issue is whether there is sufficient proof that Congress intended to *prevent* such recourse. The [Rail] Act being admittedly silent on the point, the issue becomes whether the scheme of the [Rail] Act, supplemented by the legislative history, sufficiently evidences a Congressional intention to withdraw a remedy that would otherwise exist." 384 F. Supp., at 939.

Our decisions affirm that this is the correct inquiry. The general rule is that whether or not the United States so intended, "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." *United States* v. *Causby,* 328 U. S. 256, 267 (1946). "[I]f the authorized action . . . does constitute a taking of property for

which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims." *Yearsley* v. *Ross Construction Co.*, 309 U. S. 18, 21 (1940).[16] See also *Hurley* v. *Kincaid*, 285 U. S. 95 (1932). In *Yearsley*, the Court, speaking through Mr. Chief Justice Hughes, went on to hold that "it cannot be doubted that the remedy to obtain compensation from the Government *is as comprehensive as the requirement of the Constitution* . . . ." 309 U. S., at 22. (Emphasis supplied.)

We turn then to the inquiry whether the Rail Act withdrew the Tucker Act remedy "that would otherwise exist." 384 F. Supp., at 939. The argument that it should be so read rests on provisions of the Rail Act said plainly to evince Congress' determination that no federal funds beyond those expressly committed by the Act were to be paid for the rail properties.

The first provision referred to is § 209 which provides for the impaneling of the Special Court and the consolidation before it of "all judicial proceedings with respect to the final system plan." The argument attaches significance to the omission in § 303 of any authority in the Special Court to enter a judgment against the United States. Reliance is also placed on two of the Act's funding provisions. Section 210 (b), captioned "Maxi-

---

[16] As this passage from *Yearsley* indicates, the Government action must be authorized. "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government," and hence recovery is not available in the Court of Claims. *Hooe* v. *United States*, 218 U. S. 322, 336 (1910). See also *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 585 (1952). These cases are inapposite since the Government actions at issue here are authorized by the Rail Act.

mum obligational authority," provides that the "aggregate amount of [USRA] obligations . . . which may be outstanding at any one time shall not exceed $1,500,000,-000 of which the aggregate amount issued to [Conrail] shall not exceed $1,000,000,000 . . . ," and that "[a]ny modification to [these] limitations . . . shall be made by joint resolution adopted by the Congress." Section 214 explicitly appropriates up to $12,500,000 to the Secretary of Transportation, to pay the expenses of "preparing the reports and exercising other functions to be performed by him under this chapter," appropriates up to $5,000,000 to the Interstate Commerce Commission for its use in carrying out its functions, and appropriates up to $26,000,000 to USRA "for purposes of carrying out its administrative expenses . . . ."

But these provisions at least equally support the inference that Congress was so convinced that the huge sums provided would surely equal or exceed the required constitutional minimum that it never focused upon the possible need for a suit in the Court of Claims. That this may very well have been the case is evident in a statement in the House Report:

> "The timely implementation of the Final System Plan cannot be obstructed by controversy over the payment for the properties. The Committee is of the opinion that provisions of this title of the [Rail] Act, and especially the provision for deficiency judgment and payment of obligations of [USRA] . . . are more than adequate to guarantee that the creditors of the bankrupt railroad will receive all that they may Constitutionally claim. In view of these extraordinary protections, no litigation should be permitted to delay the Final System Plan." H. Rep. 55.

That inference also finds support in the provision of

§ 303 (c)(3) that authorizes the Special Court to reduce payments to bankrupt estates if they "are fairer and more equitable than is required as a constitutional minimum." That provision suggests that Congress thought the compensation made possible by the Rail Act could well exceed that required by the Constitution, and gave no consideration to withdrawal of the Tucker Act remedy because it was sure the Rail Act itself provided at least the constitutional minimum compensation.

Finally, the manner in which Congress in § 601, 45 U. S. C. § 791 (1970 ed., Supp. III), expressly addressed the Rail Act's "Relationship to other laws" plainly implies that Congress gave no thought to consideration of withdrawal of the Tucker Act remedy. Section 601 (a)(2) provides that the "antitrust laws are inapplicable with respect to any action taken to formulate or implement the final system plan . . ."; § 601 (b) provides that "[t]he provisions of the Interstate Commerce Act and the Bankruptcy Act are inapplicable to transactions under this chapter to the extent necessary to formulate and implement the final system plan whenever a provision of any such Act is inconsistent with this chapter"; § 601 (c) provides that, "[t]he provisions of section 4332 (2)(C) of Title 42 [National Environmental Policy Act of 1969] shall not apply with respect to any action taken under authority of this chapter before the effective date of the final system plan." Yet despite this clear evidence that Congress was aware of the necessity to deal expressly with inconsistent laws, Congress nowhere addresses the Tucker Act question.

It is argued that any uncertainty in the scheme and text of the Rail Act is cleared up by legislative history from the House and the Senate that discloses that Congress meant the Rail Act to withdraw the jurisdiction of the Court of Claims under the Tucker Act. To the con-

trary, we read the legislative history as disclosing no more than a repeatedly emphasized belief that the Rail Act's provisions for compensation for the rail properties assured payment of the constitutional minimum. This is plainly the import of the oft-stated view that the taxpayers would not be unduly burdened by the sums provided, see, *e. g.,* 119 Cong. Rec. 36354 (1973) (remarks of Rep. Metcalfe); *id.,* at 36359 (remarks of Rep. Conte); and also of Senator Hartke's explanation of the Conference Report to the Senate, *id.,* at 43094–43095, which included the statement:

> "If we did nothing while continuing to mandate rail service, there is the distinct possibility in view of the prior action of Congress that a number of these people could make a claim against the Government which could be sustained in the Court of Claims." [17]

[17] "Mr. HARTKE. We are providing that the creditors of this corporation would be required to take common stock in the new quasi-government operation. In other words, they are exchanging their present security interest in the rail properties for common stock in the new corporation.

"The railroad properties then become the properties of the new corporation free and clear of liens and encumbrances. In other words, the assets are being transferred and the rights are being changed. The nonrailroad property will remain in the bankruptcy court to be dealt with by them. One can talk about what is available if the railroad is liquidated and put through the wringer, but even then the chances of these creditors getting their money is [*sic*] relatively slim, and this country cannot afford cessation of rail service while the railroads are put through the wringer. So what, in effect, is called the 'cram down' theory forces them to accept this kind of settlement and judges have ruled that this is fair. If we did nothing while continuing to mandate rail service, there is the distinct possibility in view of the prior action of Congress that a number of these people could make a claim against the Government which could be sustained in the Court of Claims."

As the Special Court remarked, and we agree, this statement in context is "not inconsistent with the view that the Senator was so convinced that the bill, as amended in conference, contained such adequate compensation provisions that a suit in the Court of Claims could not prevail, particularly in view of what he had characterized as a 'rather slim' chance of the creditors getting their money through liquidation, rather than as meaning that such a claim could not be maintained." 384 F. Supp., at 941.

We do not think that the argument in support of reading the Rail Act to withdraw the Tucker Act remedy is aided by the colloquy on the House side between the House managers of the bill, 119 Cong. Rec. 42947 (1973).[18] That colloquy does not even concern the with-

---

[18] "Mr. KUYKENDALL. Mr. Speaker, I would like to ask the gentleman from Washington to clarify one point, and that is the matter of the deficiency judgment. There was a lot of colloquy in the original debate which expressed fears that the Federal court had the key to the Treasury.

"Will the gentleman give us his interpretation of the guarantees we have to keep that from happening in the court proceedings?

"Mr. ADAMS. Mr. Speaker, there is a definite limitation on the total amount that can be authorized under this bill. Any amounts that go beyond that, or the shifting of the way in which it is spent, is to be approved by an act of Congress, to be signed by the President. It is defined as a joint resolution in the bill, and the statement of the managers, and it was the clear intent of the managers that any amount other than common stock was to be at the lowest possible limit to meet the constitutional guarantees.

"Mr. KUYKENDALL. Mr. Speaker, is it not true, I will ask the gentleman from Washington (Mr. ADAMS) that the creditors, of course, are given protection, and that the Board of Directors, under the control of Government officials, is the owner of the entire block of stock of 100 million shares, whatever it is?

"Mr. ADAMS. The gentleman is correct. It is controlled by the United States, so long as the Secretary determines that there is an

drawal of Court of Claims jurisdiction. It concerns only the deficiency judgment against Conrail and the powers of the Special Court.

Finally, reliance is put upon what is referred to as "subsequent legislative history" in the form of statements. by Congressmen during Oversight Hearings of the House Subcommittee on Transportation and Aeronautics on June 14, 1974, and on an *amicus* brief filed in this Court on behalf of 36 Congressmen. But post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage. See, *e. g., United States* v. *Mine Workers of America,* 330 U. S. 258, 282 (1947). Such statements "represent only the personal views of these legislators, since the statements were [made] after passage of the Act." *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612, 639 n. 34 (1967). Moreover, during oral argument before this Court, Representative Adams, spokesman for the congressional group, expressly conceded that circumstances might arise when the Tucker Act remedy would be available:

> "QUESTION: So you do anticipate a situation where the Tucker Act would be available?
>
> "MR. ADAMS: Oh, yes. Let's say, for example, that after this is all over—and this is the three-judge court's problem—that if a party comes in and says,

amount of obligation funds which the United States might, in any way ever, have to have anything to do with.

"During that period of time, it is controlled by a board of directors which consists of Government officials.

"Mr. KUYKENDALL. There is no way the Federal court may assess the taxpayers or this Congress on the judgments of the creditors; is that correct?

"Mr. ADAMS. The gentleman is correct.

"Mr. KUYKENDALL. There is no way they can assess the Congress for the money?

"Mr. ADAMS. The gentleman is correct."

you held us beyond the constitutional limit on erosion and at that point we are of the opinion that it went just too long, it was unreasonable, but that is a specific individual case at that point.

"QUESTION: And so the Tucker Act, you think, would be available in that situation? 

"MR. ADAMS: Of course. *We did not repeal the Tucker Act.*" [19] (Emphasis supplied.)

In sum, we cannot find that the legislative history supports the argument that the Rail Act should be construed to withdraw the Tucker Act remedy. The most that can be said is that the Rail Act is ambiguous on the question. In that circumstance, applicable canons of statutory construction require us to conclude that the Rail Act is not to be read to withdraw the remedy under the Tucker Act.

One canon of construction is that repeals by implication are disfavored. See, *e. g., Mercantile National Bank* v. *Langdeau,* 371 U. S. 555, 565 (1963); *United States* v. *Borden Co.,* 308 U. S. 188, 198–199 (1939); *Amell* v. *United States,* 384 U. S. 158, 165–166 (1966). Rather, since the Tucker Act and the Rail Act are "capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to re-

---

[19] Tr. of Oral Arg. 50–51.

At three other times during oral argument Representative Adams implied that the Tucker Act was available for takings resulting from the Rail Act. See *id.,* at 48 ("As Justice White was asking in his question, is there a right to sue for some failure—maybe we hold a party too long, then they could"); *id*, at 49 ("Now as far as the *Causby* case is concerned, *Hurley* v. *Kincaid* and the other Tucker Act cases, we did not try to repeal the Fifth Amendment or certainly repeal the Tucker Act jurisdictional statements"); *id.,* at 50 ("If you decide, however, that there may be, some place along the line, in the lawful process, a mistake, then you reach and say the Tucker Act case will have to be decided when and if some party can decide that they have created a case on the merits").

gard each as effective." *Morton* v. *Mancari,* 417 U. S. 535, 551 (1974). Moreover, the Rail Act is the later of the two statutes and we agree with the Special Court:

> "A new statute will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled. . . . This principle rests on a sound foundation. Presumably Congress had given serious thought to the earlier statute, here the broadly based jurisdiction of the Court of Claims. Before holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end. . . ." 384 F. Supp., at 943.

The other relevant canon of construction that comes into play is that when a statute is ambiguous, "construction should go in the direction of constitutional policy." *United States* v. *Johnson,* 323 U. S. 273, 276 (1944). There are clearly grave doubts whether the Rail Act would be constitutional if a Tucker Act remedy were not available as compensation for any unconstitutional erosion not compensated under the Act itself. In such case, as the Special Court observed, "[w]hen one admissible construction will preserve a statute from unconstitutionality and another will condemn it, the former is favored even if language, . . . and arguably the legislative history point somewhat more strongly in another way." 384 F. Supp., at 944. In other words our "task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *CSC* v. *Letter Carriers,* 413 U. S. 548, 571 (1973).

*Lynch* v. *United States,* 292 U. S. 571 (1934), fully sup-

ports our conclusion. *Lynch* presented a situation requiring this Court to determine whether a statute that effected an unconstitutional taking was also to be construed to withdraw a cause of action created by an earlier statute. The Economy Act of 1933, 48 Stat. 11, provided in § 17 that "all laws granting or pertaining to yearly renewable term insurance are hereby repealed . . . ." District Courts, affirmed by the Courts of Appeals for the Fifth Circuit, 67 F. 2d 490 (1933), and the Seventh Circuit, *Wilner* v. *United States,* 68 F. 2d 442 (1934), dismissed, on the basis of this provision, suits by beneficiaries of yearly renewable term policies brought under § 405 of the War Risk Insurance Act of 1917, 40 Stat. 410, expressly authorizing suits in the district courts respecting any "disagreement as to a claim under the contract of insurance." The beneficiaries' claim was that there was an actionable "disagreement" within the meaning of § 405 because the Government had violated the terms of the policies by failing to pay the premiums when the insureds became totally and permanently disabled and had refused payment of benefits after the insureds died. This Court unanimously reversed the dismissals. Section 17 of the Economy Act was held to effect an unconstitutional taking of vested property rights in the beneficiaries created by the insurance contracts. The question then became whether § 17 had repealed the remedy of a suit in the district court provided by § 405 of the Insurance Act. The Court held, speaking through Mr. Justice Brandeis, that § 17 would not be read as depriving the beneficiaries of that remedy in the absence of a clear indication from Congress that the remedy was taken away. The Court said:

> "*Fifth.* There is a suggestion that although, in repealing all laws 'granting or pertaining to yearly renewable term insurance,' Congress intended to take

136

away the contractual right, it also intended to take away the remedy; that since it had power to take away the remedy, the statute should be given effect to that extent, even if void insofar as it purported to take away the contractual right. The suggestion is at war with settled rules of construction. It is true that a statute bad in part is not necessarily void in its entirety. A provision within the legislative power may be allowed to stand if it is separable from the bad. But no provision however unobjectionable in itself, can stand unless it appears both that, standing alone, the provision can be given legal effect and that the legislature intended the unobjectionable provision to stand in case other provisions held bad should fall. *Dorchy* v. *Kansas,* 264 U. S. 286, 288, 290. Here, both those essentials are absent. There is no separate provision in § 17 dealing with the remedy; and it does not appear that Congress wished to deny the remedy if the repeal of the contractual right was held void under the Fifth Amendment." 292 U. S., at 586.

Similarly, "[t]here is no separate provision in [the Rail Act] dealing with the [Tucker Act] remedy; and it does not appear [from the statute or its legislative history] that Congress wished to deny the remedy" if the Rail Act should cause an "erosion taking" that would require the payment of just compensation.

We accordingly hold that the Tucker Act remedy is not barred by the Rail Act but is available to provide just compensation for any "erosion taking" effected by the Rail Act.

## V

### A

#### *The Alleged "Conveyance Taking"*

The District Court declined to decide whether the provisions governing the procedures for and terms of the

final conveyance of rail properties to Conrail (the "conveyance taking" issue) violate the Fifth Amendment, thus rendering the Rail Act invalid in its entirety.[20] The District Court was "persuaded that these issues are premature." 383 F. Supp., at 517.

Briefly, the challenges to the final-conveyance provisions assert that the Rail Act is basically an eminent domain statute and, because compensation is not in cash but largely in stock of an unproved entity, will necessarily work an unconstitutional taking.[21] A variant of the argument is that, even if a reorganization statute, the Rail Act would be unconstitutional unless the Tucker Act remedy is now held to assure payment of any amount by which the *market value* of stocks and securities awarded by the Special Court is less than the value of the rail properties conveyed. The New Haven Trustee goes further; he argues that even if a reorganization statute, the Rail Act violates substantive due process by failing to assure the "fair and equitable equivalent" of the rail properties valued at their "highest and best use." The New Haven Trustee also contends that the conveyance provisions constitute a taking such as that threatened by interim erosion: they require operations of the railroad to continue, albeit in a different form, even if the liquidation value for "highest and best use" is greater than the value of the railroad as a going concern. Finally, the

[20] The conveyance provisions are the heart of the Rail Act. Thus, if it were clear that they were unconstitutional, a strong argument might be made that they are inseverable from the remainder of the Act and that the Act as a whole is void.

[21] The New Haven Trustee in his Reply Brief 45–46 seems to concede that valuation at market value of any Conrail stock may be sufficient. He then suggests, however, that it might be impossible, for legal and practical reasons, to offer Conrail stock publicly for many years. Thus, he claims, there will be no way to ascertain market value, and he implies that the market value will effectively be zero.

New Haven Trustee and the creditor parties contend that the conveyance provisions deny procedural due process, because they mandate the final conveyance before any meaningful determination of its fairness, and because no provision is made for creditor or stockholder consideration of or voting upon the Final System Plan.

All of the parties now urge that the "conveyance taking" issues are ripe for adjudication. However, because issues of ripeness involve, at least in part, the existence of a live "Case or Controversy," [22] we cannot rely upon concessions of the parties and must determine whether the issues are ripe for decision in the "Case or Controversy" sense. Further, to the extent that questions of ripeness involve the exercise of judicial restraint from unnecessary decision of constitutional issues,[23] the Court must determine whether to exercise that restraint and cannot be bound by the wishes of the parties.

The District Court's holding of prematurity was influenced by the statutory scheme that requires several decisional steps before the final conveyance. The possibility that the reorganization court might determine under § 207 (b) that the Rail Act process is not fair and equitable to the railroad estate, or that Congress might disapprove the Final System Plan, § 208 (a), or that the Special Court would not order the final conveyance pursuant to § 303 (b), led the District Court to conclude that the question whether the final-conveyance provisions are constitutional was "too speculative to warrant anticipa-

---

[22] *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–242 (1937); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941); *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 140–141 (1951); *id.,* at 154–155 (Frankfurter, J., concurring).

[23] *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring); *Poe* v. *Ullman,* 367 U. S. 497, 502–503 (1961).

tory judicial determinations." *Eccles* v. *Peoples Bank,* 333 U. S. 426, 432 (1948).[24]

But subsequent to the District Court's opinion, the Penn Central Reorganization Court determined that the Rail Act did not provide a process that would be fair and equitable to the estate, *In re Penn Central Trans. Co.,* 382 F. Supp. 856 (ED Pa. 1974). On appeal to the Special Court under § 207 (b), that determination has been reversed, although the Special Court has not rendered its judgment, pending our decision of this case. 384 F. Supp., at 955. See n. 14, *supra.*

We agree with the parties that this change in circumstance has substantially altered the posture of the case as

---

[24] Judge Fullam disagreed with the majority below on the ripeness of some of the final-conveyance issues, 383 F. Supp., at 530–533. Among other things, he observed that the validity of the final-conveyance provisions was inextricably interwoven with the issues concerning interim erosion which the three-judge court did address. As suggested, *supra,* at 122–124, the constitutionality of requiring deficit railroad operations by a railroad in reorganization may depend in part upon the likelihood of a successful reorganization; if the provisions for the final conveyance were facially unconstitutional, there would be little likelihood of such reorganization, and it might be necessary to permit immediate abandonment for that reason alone. 383 F. Supp., at 530–533. We believe, unlike Judge Fullam, that the Tucker Act is available to compensate any unconstitutional taking which might arise from interim erosion. See *supra,* at 125–136. However, his observation about the interrelationship of the "erosion taking" and the "conveyance taking" issues is still pertinent. If it were entirely clear that no reorganization could take place under the Act because its conveyance provisions were unconstitutional, it might be pointless to permit continuing erosion of the estate and the inevitable buildup of a huge Tucker Act claim. Thus, we would have to decide whether those portions of the Act severely limiting abandonments are severable from the conveyance provisions. Because we find that some of the final-conveyance issues require resolution at this juncture for independent reasons, we need not determine whether we would have to confront any of them anyway in order completely to determine the validity of the abandonment provisions.

regards the maturity of the final-conveyance issues. Whatever may have been the case at the time of the District Court decision, there can be little doubt, for reasons to be detailed, that some of the "conveyance taking" issues can and must be decided at this time. And, since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern. [25]

*First,* the implementation of the Rail Act will now lead inexorably to the final conveyance, although the exact date of that conveyance cannot be presently determined. It is true that Congress can reject the first plan presented to it by the USRA, § 208 (a), and that the Rail Act, while prescribing with precision the timing of the presentation of that plan, §§ 207 (c) and (d), does not mandate the presentation of successive plans at any particular time. The Rail Act does, however, contemplate that USRA will continue to present plans, § 208 (b), until one becomes "effective," § 209 (a). Thus, we must assume there will be compliance with the Rail Act's mandatory terms in this respect and that a Final System Plan will at some time be certified to the Special Court. § 209 (c).[26]

---

[25] It might be appropriate under different circumstances only to decide that the issues are ripe, and to remand to the District Court for their determination on the merits. However, such a remand here would be both undesirable and unnecessary. The Rail Act provides a strict timetable for its implementation. Any delay occasioned by remanding to the District Court could seriously impede that timetable and frustrate the accomplishment of the Rail Act's objectives. Further, these issues have been fully ventilated by these same parties in the Special Court, which proceeded to decide them.

[26] The parties have stipulated that "[i]t is likely" that some of the rail properties of Penn Central will be designated for transfer, sale, or other conveyance in any Final System Plan executed under the Rail Act. App. 205, 318–319, 370–371. Since the Penn Central system holds an overwhelming percentage of the trackage, see n. 12,

*Second,* the Special Court is mandated to order the conveyance of rail properties included in the Final System Plan and is granted no discretion not to order the transfer.[27] While mandatory language does not necessarily deny a court of equity flexibility, *Hecht Co.* v. *Bowles,*

*supra,* to be reorganized under the Act, it is inconceivable that all of the Penn Central rail properties could be eliminated from the Final System Plan without destroying the possibility of achieving the goals of the Act. See §§ 101, 206 (a), 45 U. S. C. §§ 701, 716 (1970 ed., Supp. III). While the Act does contemplate that, under the Final System Plan, some of the rail properties may be designated for transfer to existing profitable railroads, §§ 206 (c)(1)(B), 206 (d)(2), 209 (c)(2), 303 (a)(2), 303 (b), 45 U. S. C. §§ 701 (c)(1) (B), 716 (d)(2), 719 (c)(2), 743 (a)(2), 743 (b) (1970 ed., Supp. III), no such transfer can occur unless the purchaser railroad agrees to the purchase. § 206 (d)(4). If any substantial portion of the Penn Central rail properties were an attractive investment for an existing railroad, the reorganization of the Penn Central presumably could have been accomplished under § 77, without recourse to the novel plan envisioned by the Act. Thus, we can properly assume that some Penn Central properties will be transferred to Conrail.

[27] Section 209 (a) provides: "Notwithstanding any other provision of law, the final system plan . . . is not subject to review by any court except in accordance with this section. After the final system plan becomes effective under section 718 of this title, it may be reviewed with respect to matters concerning the value of the rail properties to be conveyed under the plan and the value of the consideration to be received for such properties."

Section 303 (b)(1) commands that within 10 days after the compensation provided in the Final System Plan has been deposited with the Special Court pursuant to § 303 (a), the Special Court "shall" order the conveyance. Section 303 (b)(2) provides that the conveyance "shall not be restrained or enjoined by any court."

Finally, § 303 (c)(1) provides: *"After* the rail properties have been conveyed . . . the special court . . . shall decide . . . whether the transfers or conveyances . . . are in the public interest and are fair and equitable . . . ."  (Emphasis added.) Thus, the statutory command is that once the Final System Plan has been presented to Congress and not disapproved, the Special Court can review it only after it has ordered the conveyance.

321 U. S. 321, 329 (1944), the central scheme of the Rail Act defers decision of any controversies over the terms of the transfer of rail properties until after the transfer has occurred. H. Rep. 55; S. Rep. No. 93–601, p. 34 (1973) (hereinafter S. Rep.).[28] The Special Court's opinion suggests that the mandatory order to convey probably could not prevent the Special Court from refusing to order the conveyance, indirectly if not by a direct injunction, if it were convinced that appellees' constitutional rights were certain to be violated. 384 F. Supp., at 931; *Marbury* v. *Madison,* 1 Cranch 137 (1803). But the possibility that a court may later decline to enforce the Rail Act as written because of its unconstitutionality cannot constitute a contingency itself pretermitting earlier consideration of the constitutionality of the Act. Cf. *Albertson* v. *SACB,* 382 U. S. 70, 76–77 (1965).

It appears, then, that the conveyance of Penn Central's rail properties to Conrail cannot be prevented by the debtor or its creditors or stockholder; and, while the exact terms of the conveyance remain to be decided, an order of the Special Court directing the conveyance is

---

[28] The Senate bill contained a provision that might be read as authorizing the Special Court to refuse to order the conveyance if it found it not fair and equitable. S. 2767, § 303 (c)(2). See S. Rep. 35. However, this provision was deleted. It seems fundamentally at odds with §§ 303 (b) and (c)(1) of the Senate bill, and with the intent expressed by the Senate Committee Report, as cited in the text. We infer, therefore, that the provision was eliminated at conference precisely to make clear that the order of conveyance is mandatory, and that any litigation concerning valuation is to occur after the transfer. See H. R. Conf. Rep. No. 93–744, pp. 57, 58 (1973), which states that, except for certain provisions not pertinent here, the final bill follows the Senate version of the implementation scheme, "subject to technical and *clarifying* changes." (Emphasis added).

virtually a certainty. The Rail Act empowers no court, including this Court, to prevent it.

Thus, occurrence of the conveyance allegedly violative of Fifth Amendment rights is in no way hypothetical or speculative. Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect. *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 592–593 (1923); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 536 (1925); *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 287 (1936). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pennsylvania* v. *West Virginia, supra,* at 593.[29]

True, there are situations where, even though an allegedly injurious event is certain to occur, the Court may delay resolution of constitutional questions until a time closer to the actual occurrence of the disputed event, when a better factual record might be available. Cf. *Public*

---

[29] For this reason, decisions concerning justiciability of cases of apprehended criminal prosecution are not pertinent. Because the decision to instigate a criminal prosecution is usually discretionary with the prosecuting authorities, even a person with a settled intention to disobey the law can never be sure that the sanctions of the law will be invoked against him. Further, whether or not the injury will occur is to some extent within the control of the complaining party himself, since he can decide to abandon his intention to disobey the law. For these reasons, the maturity of such disputes for resolution before a prosecution begins is decided on a case-by-case basis, by considering the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue. Compare *Golden* v. *Zwickler,* 394 U. S. 103 (1969), with *Albertson* v. *SACB,* 382 U. S. 70 (1965); *Steffel* v. *Thompson,* 415 U. S. 452, 459 (1974).

*Affairs Press* v. *Rickover,* 369 U. S. 111 (1962). Several factors militate, however, against that course in this case.

*First,* decisions to be made now or in the short future may be affected by whether or not the "conveyance taking" issues are now decided. The constitutionality of the final conveyance may be interwoven with the validity of the abandonment provisions. See n. 24, *supra.* The Penn Central Trustees may delay expending funds for maintenance in the interval before the final conveyance if constitutional doubts linger about ultimate reorganization under the Rail Act. See Reply Brief for Penn Central Trustees 12.

*Second,* the Act is a carefully structured method for planning and implementing a reorganization scheme. It necessitates the present denial to the railroads in reorganization of options otherwise available. For example, the New Haven Trustee filed in the District Court a motion to dismiss the § 77 proceeding, and to set up an equity receivership to liquidate Penn Central's assets. So long as reorganization under the Rail Act remains possible, an equity receivership is not available.

*Third,* and particularly significant, because of the structure of the Act there is no better time to decide the constitutionality of the Act's mandatory conveyance scheme to minimize or prevent irreparable injury. The precise contours of the Final System Plan will not be known until shortly before its certification to the Special Court.[30]

[30] The Final System Plan will become "effective" if it is not disapproved by either house of Congress within 60 calendar days of continuous session from the time it is transmitted to Congress. §§ 102 (4), 208 (a), 209 (a). After that, it may still have to be changed if USRA is unable to execute agreements with profitable railroads for purchases from the reorganized railroads (within 30 days of the effective date) or for sales to Conrail or to other profitable railroads (within 60 days of the effective date). § 206 (d) (4). Thus, it is possible that the Final System Plan to be certi-

Until that Plan has been finally developed, the courts will not have any more settled facts concerning the rail properties to be conveyed, the valuation of those properties, or the value of Conrail stock and other securities to be transferred to the Penn Central estate than they do now.

After the Final System Plan is effective, the Rail Act prohibits initial judicial review of its terms except by the Special Court. §§ 209 (a), 303 (b)(2). And this review is to occur after conveyance, not before.[31] Further, as all parties agree, the conveyance, because of its complexity and because of the long time lapse probable before valuation review is completed, in practical effect will be irreversible once it is made.

Thus, we will be in no better position later than we are now to confront the validity of the final-conveyance provisions. Rather, delay in decision will create the serious risk that consideration of the validity of those provisions may either be too hasty to afford protection of rights or too late to prevent the conveyance or assure compensation if the Rail Act were found unconstitutional.[32]

We hold, therefore, that the basic "conveyance taking" issues are now ripe for adjudication. This does not mean however that we need decide now all of the contentions pressed upon us. "Even where some of the provisions

fied to the Special Court will not be known until 60 days after the effective date of the Plan. The Plan must be certified within 90 days of the effective date; however, it can be certified earlier. § 209 (c).

[31] The Special Court may have jurisdiction derived from the Constitution itself to refuse to convey if the terms of the transfer are clearly unconstitutional. See *supra*, at 142. But, as the Special Court noted, any such review would be hasty and made without adequate information. 384 F. Supp., at 931. Thus, while review at this stage is a theoretical possibility, it would not afford a better opportunity than the present one for an informed decision in light of well-developed facts.

[32] See also n. 36, *infra*.

of a comprehensive legislative enactment are ripe for adjudication, portions of the enactment not immediately involved are not thereby thrown open for a judicial determination of constitutionality." *Communist Party* v. *SACB,* 367 U. S. 1, 71 (1961).

For example, the controversy over the proper valuation theory to be applied to both the rail properties and the stock of Conrail provided as compensation depends upon contingencies that argue forcefully for postponement of its resolution. The parties have stipulated that it will be impossible to ascertain until the Final System Plan is effective which rail properties will be transferred to Conrail, or their value on *any* valuation theory, or the value of the consideration to be exchanged for the rail properties. App. 205, 319, 371. Thus, it cannot be determined now what impact any particular theory of valuation may have when applied to either side of the equation, nor can we know where the interests of the various parties lie—that is, which methods of valuation would result in higher compensation to the estate or lower cost to Conrail. Rulings on these questions would plainly be rulings upon "hypothetical situations that may or may not [arise]." *Longshoremen's Union* v. *Boyd,* 347 U. S. 222, 224 (1954).

Moreover, valuation issues peculiarly require a much more developed record than has been prepared. Without evidence of actual figures supporting various valuation theories, a court is not able to discern "what legal issues it is deciding, what effect its decision will have on the adversaries, [or] some useful purpose to be achieved in deciding them." *Public Service Comm'n* v. *Wycoff Co.,* 344 U. S. 237, 244 (1952). Clearly the record on these issues does not yet provide the "confining circumstances of particular situations," *Communist Party* v. *SACB, supra,* at 72, which best inform constitutional adjudication.

Finally, there will be ample opportunity later to litigate valuation controversies after the factual record has matured. The Rail Act in terms vests the Special Court with the initial responsibility for valuation determinations,[33] subject to review by this Court. In that circumstance, we should surely await the Special Court's determinations. *Public Service Comm'n* v. *Wycoff Co., supra,* at 246. Were we to attempt decisions of valuation questions before the Special Court's determinations, we would necessarily be forced to a speculative interpretation of a statute not clear on the subject of valuation before the court entrusted with its construction has given us the benefit of its views.[34] Cf. *Public Service Comm'n* v. *Wycoff Co., supra; Great Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 U. S. 412 (1937).

In sum, of the "conveyance taking" issues, we hold ripe for adjudication the questions (a) of the availability of the Tucker Act remedy if the consideration exchanged upon final conveyance of the rail properties is less than the constitutional minimum, (b) whether stocks, however valued, can be part of the consideration for the rail properties, and (c) whether procedural due process will be denied by the statutory process for conveyance. We hold further that decision of the questions concerning the

---

[33] The House bill attempted to define the valuation theory to be applied to the rail properties conveyed. H. R. 9142, § 102 (5); see H. Rep. 31. However, the definition of "fair and equitable value" is not in the Rail Act as adopted.

[34] The New Haven Trustee's contention that the conveyance provisions will constitute a taking because they mandate continuation of rail services indefinitely is similarly premature, because it is premised upon a hypothetical relationship between the railroad's liquidation value for "highest and best use" and its value as a going concern. Both of these values are by stipulation unknown, and the proper method of valuing the railroad properties is itself not justiciable now.

method of valuation to be applied to either the rail properties or the consideration therefor is premature.

## B

### *Availability of Tucker Act Remedy for Any "Conveyance Taking"*

Whether the Rail Act precludes the availability of the Tucker Act remedy for any amount by which the consideration exchanged for the rail properties finally conveyed falls short of the constitutional minimum need not detain us. The reasons that led to our conclusion that the Rail Act, insofar as it may work an unconstitutional taking due to interim erosion, does not render a Tucker Act remedy unavailable apply equally to the "conveyance taking" issue. No party has suggested that a difference in result can be supported. The Rail Act authorizes inclusion in the Final System Plan of different kinds of consideration in exchange for the rail properties, subject to adjustment by the Special Court to assure fairness and equity. Congress fully expected that this consideration would provide the minimum compensation required by the Constitution; it wished to provide no more. If, however, that hopeful expectation should not be fulfilled, and the consideration exchanged for the rail properties should prove to be less than the constitutional minimum, the Tucker Act will be available as the jurisdictional basis for a suit in the Court of Claims for a cash award to cover any constitutional shortfall.

## C

### *Adequacy of the Tucker Act Remedy for "Conveyance Taking"*

It is argued, however, that, even if a Tucker Act remedy remains open, the remedy is inadequate because it fails to cure basic deficiencies in the conveyance provisions of

the Rail Act.[35]   We hold, to the contrary, that while the
conveyance provisions of the Rail Act might raise serious
constitutional questions if a Tucker Act suit were pre-
cluded, the availability of the Tucker Act guarantees an
adequate remedy at law for any taking which might
occur as a result of the final-conveyance provisions.   Fur-
ther, with the Tucker Act remedy, the payment of "fair
and equitable consideration" in compliance with the re-
organization statutes is assured, and procedural due
process is satisfied.

Primarily, it is contended that the Tucker Act remedy
is inadequate because the "conveyance taking" is an exer-
cise of the eminent domain power and therefore requires
full cash payment for the rail properties.[36]   Since our rea-

---

[35] It is also contended that the Tucker Act is inadequate since
Congress may not appropriate the money awarded by the Court of
Claims.   But, as Mr. Justice Harlan wrote, "there seems to be no
sound reason why the Court of Claims may not rely on the good
faith of the United States." *Glidden Co.* v. *Zdanok,* 370 U. S. 530,
571 (1962).   See also *Albert Hanson Lumber Co.* v. *United States,*
261 U. S. 581, 587 (1923); *Silesian-American Corp.* v. *Clark,* 332
U. S. 469, 480 (1947).

We reject as well the suggestion that a Tucker Act remedy comes
too late.   See *Hurley* v. *Kincaid,* 285 U. S. 95 (1932).   Interest on
a just-compensation award runs from the date of the taking.   See,
*e. g., United States* v. *Thayer-West Point Hotel Co.,* 329 U. S. 585,
588 (1947).   Finally, contrary to the suggestion of some of the
plaintiffs below, we see no reason why a Tucker Act remedy is inade-
quate because the valuations involved may be complex.   Cf. *Phillips*
v. *Commissioner,* 283 U. S. 589, 596–601 (1931).

All of the arguments concerning inadequacy of the Tucker Act
remedy are pressed with regard to both the alleged "erosion taking"
and the alleged "conveyance taking."   As with the availability of
the Tucker Act remedy, see *supra,* at 148, there is no distinction
between these arguments or their resolutions in the two contexts.

[36] To delay until any Court of Claims adjudication with respect
to the *form* of consideration provided by the Act would be exceed-
ingly irresponsible: while the fact that Congress did not contemplate a
taking does not pretermit a Tucker Act remedy, it does suggest that

sons supporting the availability of the Tucker Act remedy assume that the basic compensation scheme of the Act is valid but could result in payment of less than the constitutional minimum, it might indeed be inconsistent with the Rail Act to suppose that a Tucker Act suit would lie for the *entire* value, in *cash,* of the rail properties.

This argument fails, however, for two reasons. First, it is extremely questionable whether, even if the Rail Act were on its face an acquisition of private property for public use, the entire value of the property acquired would have to be paid in cash. More important, we believe that there is nothing in the Act fundamentally at odds with the expressed purpose of Congress to supplement the reorganization laws, see H. Rep. 29, and, with the Tucker Act, the Rail Act is valid as a reorganization statute.

No decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes. Statements can be found in opinions that the compensation "must be a full and perfect equivalent for the property taken," *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 326 (1893); must reimburse "the full and perfect equivalent in money of the property taken," *United States* v. *Miller,* 317 U. S. 369, 373 (1943); and must be the "full monetary equivalent of the property taken," *United States* v. *Reynolds,* 397 U. S. 14, 16 (1970); see also *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 473 (1973).[37] Yet, in none of these cases was com-

Congress might wish to consider whether to abandon the whole Act if it turned out that the *entire* value of the rail properties must be paid in cash.

[37] At least two of the complaining parties agree that, to the extent compensation to the rail estates is paid in obligations of USRA backed by federal guarantees, the securities can be figured at face value as the perfect equivalent of money. Reply Brief for Cross-

pensation in a form other than cash at issue. The clear implication of other decisions is that consideration other than cash—for example, any special benefits [38] to a property owner's remaining properties—may be counted in the determination of just compensation. *Bauman* v. *Ross,* 167 U. S. 548, 584 (1897); see 3 P. Nichols, Eminent Domain § 8.62 *et seq.* (rev. 3d ed. 1974).[39]

We need not, however, determine whether compensation in the form of securities would be constitutional if the Rail Act were merely an eminent domain statute;

Appellant New Haven Trustee 45; Brief for Appellee Penn Central Co. 56. See §§ 206 (h), 210, 303 (c) (2).

[38] The special-benefits rule of compensation may later have direct relevance to the Penn Central reorganization. The Act provides that determination of the fairness and equity of the terms of the transfer should take into account "securities and *other benefits*" (emphasis added) provided to the railroad estate. § 303 (c) (2). See also § 206 (d) (1). The parties here disagree about what "other benefits" may be under the Act, and the extent to which any such may be counted as constitutional consideration. In particular, there is a dispute over whether the sums up to $250,000,000 in benefits to be paid Conrail as reimbursement for certain labor expenses are "other benefits" to be counted in evaluating the exchange. See § 509, 45 U. S. C. § 779 (1970 ed., Supp. III). For the reasons given *supra,* at 146–147, with respect to other valuation problems, this issue is presently premature.

[39] The claim is also made that, whatever the form of compensation proper under the Fifth Amendment, the legislature cannot specify the form of compensation but must leave the decision to the judiciary. This argument is based upon an erroneous reading of *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 327 (1893). *Monongahela* held only that the legislature could not, by setting either a fixed amount to be paid for property condemned or a principle for arriving at that amount, settle the constitutional right to just compensation. Thus, *Monongahela* did no more than restate the general principle that the courts, not the legislature, are ultimately entrusted with assuring compliance with constitutional commands. It said nothing about whether Congress can dictate the mode of compensation rather than the amount.

for the arguments in favor of this construction have no merit.

*First,* it is contended that despite the express provision of § 301 (b) that Conrail "shall not be an agency or instrumentality of the Federal Government," 45 U. S. C. § 741 (b) (1970 ed., Supp. III), federal participation through federally appointed members of the board of directors constitutes Conrail a federal instrumentality.[40] From that premise the contention proceeds that the conveyance is an exercise of eminent domain. But Conrail is not a federal instrumentality by reason of the federal representation on its board of directors. That representation was provided to protect the United States' important interest in assuring payment of the obligations guaranteed by the United States. Full voting control of Conrail will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness. The responsibilities of the federal directors are not different from those of the other directors—to operate Conrail at a profit for the benefit of its shareholders. Thus, Conrail will be basically a private, not a governmental, enterprise.

*Second,* it is contended that the Rail Act's provisions for a compelled conveyance and for the continuation of rail services pending formulation of the Final System Plan constitute the Act a condemnation statute. We see

---

[40] Section 301 (d) provides:

"(d) Board of Directors.

"The Board of Directors of [Conrail] shall consist of 15 individuals selected in accordance with the articles and bylaws of [Conrail]: *Provided,* That so long as 50 per centum or more, as determined by the Secretary of the Treasury, of the outstanding indebtedness of [Conrail] consists of obligations of [USRA] or other debts owing to or guaranteed by the United States, three of the members of such board shall be the Secretary [of Transportation], the Chairman and the president of [USRA] and five of the members of such board shall be individuals appointed as such by the President, by and with the advice and consent of the Senate."

no significance in these features of the Act either. Congress, in enacting those provisions, clearly intended to legislate pursuant to the bankruptcy power. The Rail Act, like § 77 of the Bankruptcy Act, which the Rail Act supplements, merely "advances another step in the direction of liberalizing the law on the subject of bankruptcies," *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 671 (1935), and "far-reaching though [it] be, [it has] not gone beyond the limit of congressional power . . . ." *Ibid.* That is the teaching of *RFC* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495 (1946), where the Court sustained the "cram-down" provision of § 77 authorizing a reorganization court to confirm a plan despite its rejection by creditors. The Court said: "We think that the provisions for confirmation by the courts over the creditors' objection are within the bankruptcy powers of Congress. Those powers are adequate to eliminate claims by administrative valuations with judicial review and they are adequate to require creditors to acquiesce in a fair adjustment of their claims, so long as the creditor gets all the value of his lien and his share of any free assets." *Id.*, at 533.[41] Similarly, under

---

[41] An attempt is made to distinguish the "cram-down" provisions of § 77 (e) because § 77 (e) provides for a vote of all classes of creditors after the reorganization court has determined that a plan is fair and equitable. A "cram-down" is permitted only if the reorganization court finds any objection by a class of creditors "not reasonably justified." But the creditors' right to object to a plan approved by the court has a severely limited scope. "If a plan gives fair and equitable treatment to dissenters, the elements which make the plan fair and equitable cannot be the basis for a reasonably justified rejection." *RFC* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495, 535 (1946). A "reasonable" objection must be based upon facts arising *after* the original approval of the plan by the court. *Ibid.* The omission in the Rail Act of this very limited right of objection cannot constitute the Act an eminent domain statute.

the Rail Act, the Special Court has the duty to provide the railroad estates with the "fair and equitable" equivalent in Conrail securities for the rail properties conveyed.

Finally, it is argued that there are defects in the Rail Act's provisions for judicial review that identify the Act as an exercise of the eminent domain power. The argument is frivolous. Although the time has not yet arrived for the mandatory transfer to Conrail, the reorganization courts have had a full opportunity to assess the fairness of the Rail Act's scheme to the rail estates. § 207 (b). The Special Court has reviewed those determinations and under § 303 (c) will have an opportunity to review the terms of the transfer, although not the conveyance itself. In addition, neither the Rail Act itself nor the procedures thereunder finally determine the interests of the respective creditors. Those will be decided in the § 77 reorganization courts, which will distribute to creditors the consideration received for the rail properties. There are, therefore, ample adequate "[s]afeguards . . . to protect the rights of secured creditors . . . to the extent of the value of the property." *Wright* v. *Union Central Life Ins. Co.,* 311 U. S. 273, 278 (1940) ; cf. *North American Co.* v. *SEC,* 327 U. S. 686 (1946).

We are not to be understood to intimate that the Rail Act proceeding could not result in a compensable taking. We hold only that, since the Rail Act does not on its face exceed the broad scope of congressional power under the Bankruptcy Clause, cf. *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co., supra,* at 670,[42] Congress has not formulated an unconstitutional reorganization plan in compelling a reorganization wherein the compensation to appellees consists of Conrail and USRA securities and other benefits "so long as the creditor gets

---

[42] *Continental Bank* expressly notes that § 77 does not represent the limits of the bankruptcy power. 294 U. S., at 671.

all the value of his lien and his share of any free assets."
*RFC* v. *Denver & R. G. W. R. Co., supra,* at 533.

This Act does differ from other reorganization statutes such as § 77, however, in that it *requires* a conveyance before it is possible to ascertain whether this last condition will be met. Thus, the conveyance is mandated without any prior judicial finding that there will be adequate resources in the reorganized company of whatever kind to compensate the debtor estates and, eventually, their creditors. Because of this congressional insistence upon accomplishing the transfer whatever the ultimate equity of the compensation provisions, any deficiency of constitutional magnitude in the value of the limited compensation provided under the Act will indeed be a taking of private property for public use. Cf. *North American Co.* v. *SEC, supra,* at 710.[43] Since we have already determined, however, that there would then be recourse to a Tucker Act suit in the Court of Claims for a cash award to cover any constitutional shortfall, the Rail Act does provide adequate assurance that any taking will be compensated.

The remaining contentions regarding the validity of the final-conveyance provisions require little discussion in view of the availability of a Tucker Act suit.

The first contention is that, even if considered as a reorganization statute, the Rail Act fails to assure that creditors will receive the full value of their liens in stock or securities. However, we have already held that, because of the possibility that the Rail Act will work a taking, there must be assurance of consideration equal to any constitutional shortfall, and that a Tucker Act remedy is available to provide that assurance. Thus, the value of

---

[43] None of the parties question that any "taking" effected by the Rail Act will be for "public use." Cf. *Berman* v. *Parker,* 348 U. S. 26 (1954).

the stocks and securities provided under the Act is backed up by what is essentially a guarantee of cash payment for any lack of fairness and equity of constitutional dimensions. The Tucker Act remedy fulfills perfectly, then, the function of the underwriting provision approved in the *New Haven Inclusion Cases,* 399 U. S., at 486–488.

Similarly, the availability of the Tucker Act cures what might otherwise be a troublesome problem of procedural due process. The Tucker Act assures that the railroad estates and the creditors will eventually be made whole for the assets conveyed. Complainants evidence no interest in retaining their property for longer than the Rail Act requires. Indeed, their position is really that they want to be free to dispose of it sooner. Thus, there is no interest asserted in retaining the properties themselves; the only interest is in making sure that creditors receive fair compensation for those properties. On the other hand, the procedural sequence is vital to accomplishing the goals of the Act. If judicial review of the terms of the transfer was required before the conveyance could occur, the conveyance might well come too late to resolve the rail transportation crisis. As long as creditors are assured fair value, with interest, for their properties, the Constitution requires nothing more.

## VI

*Validity of the Rail Act Under Uniformity Requirement of Bankruptcy Clause*

We consider finally the contention that, because the Rail Act's provisions apply only to railroads in reorganization in the "region," the statute lacks the uniformity required by Art. I, § 8, cl. 4, of the Constitution giving Congress power "To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."

The District Court held that "recourse to the bank-

ruptcy clause to justify Congressional action is necessary only if that action impairs the obligation of contracts." 383 F. Supp., at 534 (Fullam, J., concurring). In that respect, the court found that the Rail Act adds virtually nothing to the powers already granted to reorganization courts under the "uniform and admittedly valid provisions of § 77 of the Bankruptcy Act. . . . Authority to order conveyances free and clear of liens, and to 'cram down' a plan of reorganization, already exists under § 77, and is not newly created or added by the [Rail] Act." *Ibid.*

The court determined, however, that one provision of the Rail Act is "newly created or added by the [Rail] Act." Section 207 (b) requires the reorganization court to dismiss the § 77 proceeding if it finds that the railroad is not reorganizable on an income basis within a reasonable time, *and* that the Rail Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization. The District Court noted that the *New Haven Inclusion Cases, supra,* held that inasmuch as the plan disposed of the New Haven's assets to the Penn Central for continued operations, § 77 could be used to reorganize the enterprise as an investment holding company, "at least where the plan contemplates that the bulk of the rail properties will continue to be operated as a railroad by someone." 383 F. Supp., at 534. The District Court held that § 207 (b) of the Rail Act precludes a like reorganization under § 77 by requiring dismissal of the § 77 proceedings, and to that extent violates the uniformity clause since this dismissal relates only to debtors within the region covered by the Rail Act.

We need not decide whether the District Court was correct in this respect. Following the decision of the District Court, the Penn Central Reorganization Court issued its 180-day order finding that, although Penn Central is not

reorganizable on an income basis under § 77, the Rail Act does not provide a process which would be fair and equitable to the debtor's estate. 382 F. Supp. 856, 870–871. Rather than dismiss the § 77 proceeding as required by § 207 (b), however, the court stayed its order pending an appeal to the Special Court. The Special Court found that the processes prescribed in the Rail Act are fair and equitable if a remedy exists under the Tucker Act, and reversed. 384 F. Supp., at 910–911. The Rail Act expressly provides that this holding is nonreviewable. § 207 (b). Although we need not address today the issue whether the judgment of the Special Court is subject to review, we do hold that the Tucker Act remedy is available for any uncompensated taking occurring under the Rail Act. That holding obviates the possibility that the Penn Central Reorganization Court will ever confront the provisions for dismissal of a § 77 proceeding under § 207 (b) of the Rail Act.

There remains, however, another aspect of the uniformity issue for decision. Appellees urge that the entire Rail Act violates the uniformity clause. The argument is that the uniformity required by the Constitution is geographic, *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 188 (1902), and since the Rail Act operates only in a single statutorily defined region, the Act is geographically nonuniform.

The argument has a certain surface appeal but is without merit because it overlooks the flexibility inherent in the constitutional provision. Section 77 was upheld against a like challenge on the ground of the "capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day." *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. &*

*P. R. Co.*, 294 U. S., at 671. The Court therefore held that, though § 77 was a distinctive and far-reaching statute, treating railroad bankruptcies as a distinctive and special problem, it was not "beyond the limit of congressional power."[44]

The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems. "The problem dealt with [under the Bankruptcy Clause] may present significant variations in different parts of the country." *Wright* v. *Vinton Branch*, 300 U. S. 440, 463 n. 7 (1937). We therefore agree with the Special Court that the uniformity clause was not intended "to hobble Congress by forcing it into nationwide enactments to deal with conditions calling for remedy only in certain regions." 384 F. Supp., at 915.

The national rail transportation crisis that produced the Rail Act centered in the problems of the rail carriers operating in the region defined by the Act, and these were the problems Congress addressed.[45] No railroad reorga-

---

[44] The Court observed that it is not unusual for railroads to receive disparate treatment under the bankruptcy laws:

"Railway corporations had been definitely excluded from the operation of the law in 1910 (c. 412, § 4, 36 Stat. 838, 839), probably because such corporations could not be liquidated in the ordinary way or by a distribution of assets. A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become 'insolvent or unable to meet its debts as they mature.'" 294 U. S., at 671–672.

[45] H. Rep. 25–29; S. Rep. 6–14.

nization proceeding, within the meaning of the Rail Act, was pending outside that defined region on the effective date of the Act or during the 180-day period following the statute's effective date. Thus the Rail Act in fact operates uniformly upon all bankrupt railroads then operating in the United States and uniformly with respect to all creditors of each of these railroads.

The uniformity clause requires that the Rail Act apply equally to all creditors and all debtors, and plainly this Act fulfills those requirements. *Vanston Bondholders Protective Committee* v. *Green,* 329 U. S. 156, 172 (1946) (Frankfurter, J., concurring). "No provision of the Act restricts the right of any creditor wheresoever located to obtain relief because of regionalism." 383 F. Supp., at 519.

Our construction of the Bankruptcy Clause's uniformity provision comports with this Court's construction of other "uniform" provisions of the Constitution. The *Head Money Cases,* 112 U. S. 580 (1884), involved the levy on ships' agents or owners of a 50-cent tax for any passenger not a United States citizen who entered an American port from a foreign port "by steam or sail vessel." Individuals engaged in transporting passengers from Holland to the United States challenged the levy as contrary to Art. I, § 8, cl. 1, under which Congress is empowered to lay and collect "all Duties, Imposts and Excises [which] shall be uniform throughout the United States." The argument was that the head tax violated the uniformity clause because it was not also levied on noncitizen passengers entering this country by rail or other inland mode of conveyance. The Court upheld the tax, stating:

> "The tax is uniform when it operates with the same force and effect in every place where the subject of it is found. The tax in this case . . . is uni-

form and operates precisely alike in every port of the United States where such passengers can be landed." 112 U. S., at 594.

That the tax was not imposed on noncitizens entering the Nation across inland borders did not render the tax non-uniform since "the evil to be remedied by this legislation has no existence on our inland borders, and immigration in that quarter needed no such regulation." *Id.*, at 595. Similarly, the Rail Act is designed to solve "the evil to be remedied," and thus satisfies the uniformity requirement of the Bankruptcy Clause. The argument that the Rail Act differs from the head tax statute because by its own terms the Rail Act applies only to one designated region is without merit. The definition of the region does not obscure the reality that the legislation applies to all railroads under reorganization pursuant to § 77 during the time the Act applies.

*Reversed.*

MR. JUSTICE STEWART dissents from the opinion and judgment of the Court, substantially for the reasons set out in Part II of the dissenting opinion of MR. JUSTICE DOUGLAS.

MR. JUSTICE DOUGLAS, dissenting.

These cases have created, as did the *Penn-Central Merger* cases,[1] that "hydraulic pressure" which, Mr. Justice Holmes once said, "makes what previously was clear

---

[1] See *Baltimore & O. R. Co.* v. *United States,* 386 U. S. 372 (1967); *Penn-Central Merger Cases,* 389 U. S. 486 (1968); *New Haven Inclusion Cases,* 399 U. S. 392 (1970). In *Baltimore & O. R. Co.* v. *United States, supra,* I summarize in my dissent, 386 U. S., at 452–459, some of the financial chicanery behind the creation of the "new Frankensteins" with which we now deal, *id.,* at 455.

seem doubtful, and before which even well settled principles of law will bend." [2]

If the rule of law under a moral order is the measure of our responsibility, as I have always assumed, we can only hold that the Rail Act of January 2, 1974, 87 Stat. 985, 45 U. S. C. § 701 *et seq.* (1970 ed., Supp. III), undertakes to sanction a fraudulent conveyance, as those words were used in 13 Eliz.,[3] and in our Bankruptcy Act. I have been reluctant so to conclude, implicating as it does our legislative branch in a lawless maneuver of gigantic proportions. But, baldly put, the present law is a *tour de force* to that end.

Article I, § 10, of the Constitution bars the States from passing a law "impairing the Obligation of Contracts." Though the Federal Government is not so enjoined, it is restrained by the Fifth Amendment which provides that no person can be deprived of "property" without "due process of law." I assume it is conceded that Congress, apart from the bankruptcy power in Art. I, § 8, may not impair the obligation of contracts without violating the Due Process Clause.[4] But "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment," as Mr. Justice Brandeis, writing for the Court in *Louisville Bank* v. *Radford,* 295 U. S. 555, 589 (1935), held.

This does not mean that so far as rail carriers are concerned the creditors can exact their pound of flesh, dismembering or liquidating the debtor. The public in-

---

[2] *Northern Securities Co.* v. *United States,* 193 U. S. 197, 401 (1904) (dissenting opinion).

[3] 13 Eliz., c. 5 (1570); G. Glenn, Fraudulent Conveyances & Preferences (rev. ed. 1940).

[4] *The Gold Clause* cases are on a different footing, for as Mr. Chief Justice Hughes wrote in *Norman* v. *Baltimore & O. R. Co.,* 294 U. S. 240 (1935), the power of Congress to regulate the currency and establish the monetary system was involved.

terest may not be subverted in that manner. As the Court said in *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 671 (1935), a case involving a rail reorganization under § 77 of the Bankruptcy Act, 11 U. S. C. § 205:

> "A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities can not be halted because its continuous, uninterrupted operation is necessary in the public interest . . . ."

Congress made such findings in these cases in § 101 (a) of the Act, 45 U. S. C. § 701 (a) (1970 ed., Supp. III). Hence the congressional objective in the Rail Act of preserving the assets of these six railroads [5] as part of a continuing enterprise in the form of a new corporation (for convenience called Conrail [6]) is well within the Bankruptcy Clause. The question remains, however, whether by the means it has chosen Congress has transgressed constitutional boundaries.

## I

The property is "taken for public use" within the meaning of the Fifth Amendment. First is the mandate of Congress. The Rail Act provides for an obligatory transfer of the assets of these companies to Conrail. The creditors, the trustees, the stockholders, the reorganization judge have no other option. The record makes abundantly clear what all the parties concede, that Conrail, though dubbed "a for-profit corporation" by § 301

---

[5] Penn Central Transportation Co. and its subsidiaries; Lehigh Valley Railroad Co.; Central Railroad Co. of New Jersey; Lehigh & Hudson River Railway Co.; Reading Co.; Ann Arbor Railway Co.

[6] Consolidated Rail Corp. created by § 301 of the Act, 45 U. S. C. § 741 (1970 ed., Supp. III).

(b) of the Act, 45 U. S. C. § 741 (b) (1970 ed., Supp. III), shows no prospect of being an enterprise operating on a profitable basis.[7] Penn Central losses between June 21, 1970, and December 31, 1973, were $851 million, and the Reorganization Court,[8] whose judgment we are not reviewing, found that reorganization on an income basis was not possible. The values that ride on today's decisions are therefore not based on the prospect of future profitable operations.[9] The only consideration in the framework of the Act which provides "just compensation" for the taking is in the form of "securities" of Conrail, § 206 (d)(1), 45 U. S. C. § 716 (d)(1) (1970 ed., Supp. III). If those "securities" are common stock, they will have value only insofar as Conrail will be a viable entity which generates income in excess of costs and fixed charges. If the trustees under § 77 of the Bankruptcy Act, 11 U. S. C. § 205, cannot make ends meet, there is no reason to expect that Conrail can. Conrail, to be sure, is made eligible to receive obligations of the United States Railway Associa-

[7] The Reorganization Court found that Penn-Central (the debtor) was "not reorganizable on an income basis within a reasonable time"; and that ruling has not been appealed. *In re Penn-Central Trans. Co.*, 382 F. Supp. 831, 842 (ED Pa. 1974).

[8] Section 209 (b), 45 U. S. C. § 719 (b) (1970 ed., Supp. III), designates a Special Court of three federal judges which, *inter alia*, is to pass on the question whether the plan is "fair and equitable." § 303 (c)(2), 45 U. S. C. § 743 (c)(2) (1970 ed., Supp. III). A preliminary decision by the Special Court which in certain important aspects conflicts with that of the Reorganization Court was rendered September 30, 1974. *In re Penn Central Trans. Co.*, 384 F. Supp. 895.

[9] A study commissioned by the Penn Central Trustees, on file with the ICC, estimates for Penn Central assets as of December 31, 1970, a "continued railroad use" value of $13,585,493,000 and a "liquidation of non-rail uses" at $3,532,110,000. PCTC Physical Asset Valuation Study (Apr. 1973, revised May 30, 1973), ICC Fin. Docket No. 26241 (Joint Documentary Submission No. 40).

tion (USRA), an incorporated nonprofit association created by the Act to issue obligations not exceeding $1,500,000,000, which are guaranteed by the Secretary of the Treasury, § 210, 45 U. S. C. § 720 (1970 ed., Supp. III). But of this one billion and a half not more than one billion can be issued to Conrail; of the one billion "not less than $500,000,000 shall be available solely for the rehabilitation and modernization" of the rail properties, § 210 (b). Hence $500 million might be apportioned under a plan to creditors. But if the Special Court determines under § 303 (c), 45 U. S. C. § 743 (c) (1970 ed., Supp. III), that the value of the securities given creditors in exchange for the property pledged under prior law for payment of their claims is less than the fair value of the properties conveyed, the Special Court can under § 303 (c)(2) do only three things:

1. Reallocate the securities issued;
2. Require Conrail to issue additional securities;
3. Enter a deficiency judgment against Conrail.

The common stock of Conrail is plainly only token payment. Issuance of new and different securities by Conrail would have to have interest or dividend rights to be marketable and that would bring back into play some of the forces that plague the present trustees under § 77. Any securities issued by Conrail must "minimize any actual or potential debt burden" of Conrail, § 206 (i), 45 U. S. C. § 716 (i) (1970 ed., Supp. III). Moreover, § 301 (d) of the Rail Act provides that so long as more than half the debt of Conrail is guaranteed by the Government, a majority of the 15 directors are designated from outside—the Secretary of Transportation, the Chairman and the President of the USRA, and five others named by the President with the consent of the Senate. One cannot read the Rail Act and believe that Congress thought that federal money going

into Conrail could be made subordinate to any debt created by Conrail. A contrary assumption would make the watch-dog purpose of § 301 (d) quite superfluous. Yet, unless Conrail's new debt were serviced, it could not be marketed and even if it were, it could add no element of value to the compensation received by the creditors of these railroads under a reorganization plan. The upshot is that compensation for properties acquired by Conrail would be mostly paid for in Conrail stock with a sprinkling of the bonds of the Association issued to Conrail, assuming that they were not expended in the operations of Conrail between the time it started its operation and the date of the final plan of reorganization.

The value of the properties to be transferred has not yet been determined. We held in the *New Haven Inclusion Cases*, 399 U. S. 392, 489 (1970), where the New Haven road was being shut down and its assets sold, that just compensation was to be measured by the "highest and best value" of the assets sold. In that case that value was liquidation value. In light of the findings of the Reorganization Courts in the present cases, we cannot say that the $500 million of federally guaranteed bonds comes anywhere near any reasonably assured value.[10]

---

[10] See n. 9, *supra*. In the case of Penn Central alone, the Reorganization Court said that "there is every reason to suppose that the included properties would be worth considerably more than $500 million." 382 F. Supp. 856, 864 (ED Pa. 1974) (Fullam, J.).

Judge Fullam's concurring opinion in the District Court noted:

"As a matter of simple maximization of values, if there is no 'going concern' value in the usual sense, there is no justification for continuing a reorganization proceeding, unless either or both of the following conditions are established: (1) a reasonable prospect that, because of streamlining, consolidations, and other changes in circumstances, earning power and profitability can be restored; or (2) a reasonable prospect that the public need for preserving the debtor's railroad is such that it will be appropriated for public use, and that the values inherent in its assemblage as an operating railroad will

Value of any substantial amount cannot be attributed to the common stock of Conrail, because most of the problems of the existing roads will be inherited by Conrail and its prospects of generating income in excess of costs and fixed charges are, if not nil, remote. It would be irony to call entry of a deficiency judgment against Conrail adequate to make up any deficiency. For that judgment would only eat away at any value which the common stock of Conrail had.

The vicious character of these legislative decisions is emphasized by the cram-down provision of the Rail Act. In § 77 proceedings there is a cram-down provision to prevent one class from a holdup of a fair and equitable plan. Section 77, however, allows a cram-down only if the Court *first* finds the plan fair and equitable and *after* the security holders have had their hearing. Under the Rail Act the assets are first transferred to Conrail *even before* the Special Court has made its "fair and equitable" finding. Moreover, the security holders never have a vote on the plan.

Congress has lowered all the procedural barriers and foisted on these rail carriers a conveyance of their assets which, if done by private parties in control of a bankrupt estate, would be a fraudulent conveyance. Here it is achieved by Congress' purporting to act in the "public interest." That is a taking for a public purpose; but by Fifth Amendment standards it is a taking of property without assurance of just compensation.

## II

The Court relies, as do all parties who seek to sustain the statute, on the assumed availability of a suit in

be recognized and paid for. *Cf.* Port Authority Trans. Hudson Corp. v. Hudson Rapid Tubes, 20 N. Y. 2d 457, 231 N. E. 734, cert. denied 390 U. S. 1002 (1967)." 383 F. Supp. 510, 537 (ED Pa. 1974). (Footnote omitted.)

the Court of Claims under the Tucker Act, 28 U. S. C. § 1491, to recover any shortfall between fair liquidation value and the compensation the bankrupt roads receive under the Rail Act. The Solicitor General, while initially arguing that the judgment below could be reversed without reaching the Tucker Act question, now pitches his argument in support of the statute chiefly upon the availability of a Tucker Act suit.

The Tucker Act confers jurisdiction on the Court of Claims

"to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

The Rail Act neither expressly permits nor expressly excludes a suit under § 1491. USRA says that "[o]ne searches the Rail Act in vain for a sentence such as 'The Court of Claims shall have no jurisdiction over any action alleging that the property of any person has been taken pursuant to this Act without just compensation.'" But this observation is only the beginning of analysis. It is not enough merely to note that the Rail Act carves out no exception to § 1491 in express words. "Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Boys' Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235, 250 (1970). This precept requires us to inquire whether provisions that are not mutually exclusive by their terms are so divergent in approach that they cannot co-exist in a particular setting. Congress may provide a mechanism for dealing with a particular problem that by its structure and purpose is inconsistent with a traditional avenue of relief applicable

to a broader class of cases. Under these circumstances, Congress may have supplanted the traditional remedy, albeit by implication. In my view, this is precisely what Congress has done in the Rail Act.

The Act provides a strict timetable for bringing Conrail into operation. USRA is expected to present the Final System Plan to Congress within 570 days of the enactment of the Rail Act.[11] The Plan is deemed approved unless Congress specifically disapproves within a specified period. § 208 (b). Once the plan is approved, USRA must certify it to the three-judge Special Court within 90 days, § 209 (c). Within 10 days after certification, Conrail must deposit its stock and securities with the Special Court, § 303 (a), and the court must direct the conveyance of properties to Conrail pursuant to the plan within 10 days thereafter, § 303 (b).

Congress plainly sought expedition in the process of creating Conrail. This is apparently the reason for deferring until after the transfer of the properties the question of valuation and distribution of stock to the contributing railroads.[12] The policy of expedition carries over into the provisions for judicial participation in this process. Appeals from decisions of the reorganization district courts concerning the inclusion of the debtor roads in the provisions of the Rail Act lie exclusively to

---

[11] Section 207 (c), 45 U. S. C. § 717 (c) (1970 ed., Supp. III), required the executive committee of USRA to present the final system plan to USRA's board of directors for approval within 420 days after enactment of the Act, later extended to 540 days by Pub. L. 93–488. Within 30 days after presentation by the executive committee, the board shall "approve a final system plan which meets all of the requirments of section 716 [prescribing contents of the plan and the general goals]." The plan is then submitted to Congress, § 208 (a), 45 U. S. C. § 718 (a) (1970 ed., Supp. III).

[12] See H. R. Rep. No. 93–620, pp. 54–55 (1973) (hereinafter cited as H. Rep.).

the Special Court; its decision in these appeals must be
made within 80 days, § 207 (b), 45 U. S. C. § 717 (b)
(1970 ed., Supp. III). Once the Final System Plan is
approved by Congress, § 209 (b) of the Act, 45 U. S. C.
§ 719 (b) (1970 ed., Supp. III), provides for consolidation
in the Special Court of "all judicial proceedings with
respect to the final system plan." The decision of the
Special Court regarding the distribution of Conrail stock
and securities pursuant to § 303 (c) is appealable directly
to this Court. We are directed to give the appeal "the
highest priority" and even to dismiss it within seven days
if we conclude that its pendency "would not be in the
interest of an expeditious conclusion of the proceedings."
§ 303 (d).

A suit in the Court of Claims would be quite an odd
appendage to the streamlined judicial procedures just
described. The language of § 209 (b) vesting in the
Special Court "all judicial proceedings with respect to
the final system plan" immediately raises doubt that a
Tucker Act remedy is compatible with the Act.[13] The
doubt is amplified when one looks at the entire scheme
of judicial participation. I do not think that Con-
gress, in setting up a Special Court, consolidating pro-
ceedings, limiting appeals, and demanding expeditious
decisions, intended at the same time to permit yet another
round of litigation on the compensation question to begin

---

[13] This language originated in the Senate bill. The House bill
had provided for consolidation in the Special Court of "all proceed-
ings of any kind which arise or may arise concerning the final system
plan or implementation thereof." (§ 501 (a)). The House Report
explains that "Title V . . . guarantees the creditors their day in
court and preserves their Constitutional right to a judicial determina-
tion of just compensation for their property." H. Rep. 47. The
Senate language was incorporated in the final bill, and appar-
ently no significance was attached to the disparity between the two
versions. See H. R. Conf. Rep. No. 93–744, pp. 56–59 (1973).

in the Court of Claims after all the procedures mandated by the Rail Act had been exhausted.

Despite the obvious frustration of the policy of expedition, the inference that a Tucker Act remedy is available might still be justified were it not for the special features of the compensation arrangement that limit the infusion of federal funds. As will be seen, these features were important to Congress, and they are circumvented if a suit in the Court of Claims is allowed.

The Special Court, after it has directed the transfer to Conrail of "all right, title, and interest" in the properties of contributing roads designated in the Final System Plan, § 303 (b), must determine whether the transfers of property from the bankrupt roads are "fair and equitable to the estate." But the Special Court has only limited tools for rectifying any unfairness or inequity it finds, and the limitations on its powers quite clearly indicate congressional intent to limit the commitment of federal funds. The preferred form of compensation to the debtor roads is stock of Conrail. § 303 (c)(2)(A). If the stock is insufficient, the Special Court may next order distribution of Government-guaranteed obligations of Conrail, § 303 (c)(2)(B), but these are limited in face value to $500 million,[14] absent an authorization by joint resolution of Congress to exceed the limitation. If any shortfall remains after distribution of stock and Government-guaranteed obligations, the Special Court is directed to enter a deficiency judgment against Conrail, § 303

---

[14] Under § 210 (b), 45 U. S. C. § 720 (b) (1970 ed., Supp. III), USRA is authorized to issue Government-guaranteed obligations not exceeding $1.5 billion. Only $1 billion, however, may be issued to Conrail, and of this amount $500 million must be made available solely for rehabilitation and modernization of properties acquired from contributing roads. This leaves $500 million of obligations available to the Special Court for distribution to the estates under § 303 (c)(2)(B).

(c)(2)(C). The judgment is against the corporation and not the United States, with the apparent purpose of protecting the Treasury from a liability of unanticipated magnitude. As Representative Adams, one of the principal architects of the Rail Act in the House, explained when specific assurances about the federal exposure were sought early in debate on the bill:

> "Mr. ADAMS. There is a specific limitation in the final bill which says no more than $200 million [later raised to $500 million] of Government loan guarantees can be used for acquisition in any event, so if the court in 5 to 10 years should come in with a higher value, the only judgment would be against this new corporation that is there.
>
> "Under the New Haven case the court was placed in this kind of position that if it loads up that new corporation with a debt structure by requiring it to issue additional bonds, it lowers the value of the common stock, which is what it is being paid for in terms of these assets.
>
> "Mr RUPPE. Does it not have to deliver more stock? It seems to me from reading the language that we have to cause the corporation securities issued in payment of the properties to have a value which is a fair and equitable value as determined by the court.
>
> "Mr. ADAMS. That is correct, but that is this corporation's and not the taxpayers of the United States money." 119 Cong. Rec. 36355 (1973).

The possibility that there might be a large deficiency judgment was not unnoticed. See *id.*, at 36352 (remarks of Rep. Skubitz) and 36355 (remarks of Rep. Shoup). But those who adverted to this possibility noted that Congress would have an opportunity to consider later

whether to deal with it by relaxing the limitations on the amount of Government loan guarantees available to Conrail, by means of a joint resolution as provided in § 210 (b). Congress was thus to have a "second look" at the debt structure of Conrail after the Special Court valuation proceedings had concluded; at that point Congress might improve the corporation's balance sheet by an additional commitment from public funds. What is clear, however, is that Congress intended to preserve a choice whether to allow Conrail to begin life with a large deficiency judgment unalleviated by further federal aid.[15]

[15] Were Congress so to choose, the creditors of the bankrupt roads, armed with a large deficiency judgment, might cause a levy to be made upon Conrail's assets. Since the value of Conrail stock held would presumably reflect the value of the assets, a levy would not give the estates any additional value but would merely change its form. Liquidation would, at most, terminate further erosion of asset value due to continued unprofitable operations.

An *amicus* brief submitted by Representative Adams for himself and 35 other Representatives suggests that liquidation would allow the creditors to get back what they relinquished, involuntarily, to Conrail (p. 7). But, as the Special Court noted, this position ignores the probable erosion of asset value during the pendency of valuation proceedings, the possibility of new senior debt, and the difficulty of unscrambling the assets. *In re Penn Central Trans. Co.*, 384 F. Supp., at 930.

Appearing as *amicus curiae* at oral argument, Representative Adams made statements that the majority now reads as indicating a conclusion that a Tucker Act suit would be available to remedy an uncompensated "erosion taking." *Ante,* at 132–133. Yet this position is contrary to that taken in the brief Mr. Adams submitted, which urges us to decide the case without reaching the Tucker Act question and specifically cites the colloquy printed, *infra,* at 174–175. The Court properly notes that these post-enactment expressions should be treated with caution, a warning that applies as much to the "relatively spontaneous responses of counsel to equally spontaneous questioning from the Court," *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 170 (1972), as to the more considered statements that appear in written submissions. Viewed in their entirety, the post-

To hold that a Tucker Act remedy is available is, *first*, to leave just compensation of security holders to wholly speculative chances that Congress might grant it and, *second*, to deprive Congress of that opportunity to choose, since the bankrupt estates would be permitted to obtain a deficiency judgment against the United States after proceedings under the Rail Act have been exhausted. Assurances against such an eventuality were given in the following colloquy between two of the managers for the House, during debate on the conference report:

"Mr. KUYKENDALL. Mr. Speaker, I would like to ask the gentleman from Washington to clarify one point, and that is the matter of the deficiency judgment. There was a lot of colloquy in the original debate which expressed fears that the Federal court had the key to the Treasury.

"Will the gentleman give us his interpretation of the guarantees we have to keep that from happening in the court proceedings?

"Mr. ADAMS. Mr. Speaker, there is a definite limitation on the total amount that can be authorized under this bill. Any amounts that go beyond that, or the shifting of the way in which it is spent, is to be approved by an act of Congress, to be signed by the President. It is defined as a joint resolution in the bill, and the statement of the managers, and it was the clear intent of the managers that any amount other than common stock was to be at the lowest possible limit to meet the constitutional guarantees.

"Mr. KUYKENDALL. Mr. Speaker, is it not .

---

enactment expressions are ambiguous and add little to the statute and legislative history. Moreover, Mr. Adams' remarks bear an interpretation fully consistent with the nonavailability of the Tucker Act. See *infra,* at 177.

true, I will ask the gentleman from Washington (Mr. Adams) that the creditors, of course, are given protection, and that the Board of Directors, under the control of Government officials, is the owner of the entire block of stock of 100 million shares, whatever it is?

"Mr. ADAMS. The gentleman is correct. It is controlled by the United States, so long as the Secretary determines that there is an amount of obligation funds which the United States might, in any way ever, have to have anything to do with.

"During that period of time, it is controlled by a board of directors which consists of Government officials.

"Mr. KUYKENDALL. There is no way the Federal court may assess the taxpayers or this Congress on the judgments of the creditors; is that correct?

"Mr. ADAMS. The gentleman is correct.

"Mr. KUYKENDALL. There is no way they can assess the Congress for the money?

"Mr. ADAMS. The gentleman is correct." 119 Cong. Rec. 42947 (1973).

None of these comments refer expressly to the Court of Claims or to the Tucker Act. But the implication of depriving the courts of a "key to the federal Treasury" is powerful, and the reference to "assess[ing] Congress for the money" equally so, since that is in practical terms what the Court of Claims does. For me, the import of the words is clear: there was to be no possibility that an aggrieved party was to have recourse against the United States in such a way as to circumvent the limitations on federal funds embodied in the Rail Act.[16] On

---

[16] The House Report in its cost estimate specifically notes those cost elements as to which the ceiling is not fixed, such as the open-

oral argument as *amicus curiae*, Representative Adams stated that Congress had not repealed the Tucker Act. The majority seizes upon this statement as a concession that suit might be brought in the Court of Claims to

ended authorization for a federal contribution to operating subsidies paid for local rail service. This authorization, originally contained in § 701 of the House bill, appears in § 402 of the Rail Act, 45 U. S. C. § 762 (1970 ed., Supp. III), subject to an annual limitation of $90 million. Significantly, there is no mention of a possible Court of Claims judgment of uncertain but potentially astronomical proportions. See H. Rep. 30. The Senate Report is similar. In a section entitled "Minimizing Taxpayer Expense" it explains:

"Although the amounts of money required to implement the rationalization and restructuring of the bankrupt railroads in the Northeast authorized by this legislation may seem substantial to the uninitiated, every effort has been made to design a bill which minimizes the direct cost to the U. S. taxpayer. Indeed, the very process by which the bill would create a new healthy railroad out of the bankrupt ones arose from this strong desire to limit the use of Federal money. The bill is thus written to permit the transfer of the required rail properties of the bankrupt estates in exchange for securities of the new corporation via a reorganization plan under the umbrella of a Section 77 proceeding under the Bankruptcy Act. In addition, the bill calls for the use of Federal loan guarantees rather than direct grants wherever possible. This procedure allows for the necessary funds to come from the private sector in exchange for loans which are to be repaid by the new Corporation or other recipients. The use of loan guarantees in this instance was felt to be particularly appropriate since they will support a new railroad with excellent earnings prospects." S. Rep. No. 93–601, p. 18 (1973).

In the section on cost estimates it is noted: "The obligational authority of the Association is limited to $150,000,000 to finance the Secretary's agreements with railroads in reorganization for the acquisition, maintenance and improvement of rail facilities prior to the completion of the final system plan. Under the bill any additional obligation authority necessary for the implementation of the final system plan must be designated in the final system plan and affirmatively approved by a joint resolution of Congress." *Id.*, at 125–126. Had Congress intended to allow a Tucker Act remedy in addition to all that was created by the Rail Act, all of the foregoing assurances would have been worthless.

supplement compensation. But that interpretation of his words is overborne by the manifestations of a contrary congressional intent reviewed above. Mr. Adams' remarks, however, have a straightforward import that accords with the colloquy cited above and with the position taken in the brief he filed with this Court, which urged us to uphold the Rail Act without reference to a Tucker Act remedy. His remarks confirm that the Tucker Act remains available to enforce obligations against the United States (and not merely against Conrail) created by the Act. For example, should the Government fail to make good on its guarantee of bonds issued under § 210, holders thereof could obtain relief in the Court of Claims.

We are asked to infer a Tucker Act remedy by applying the canon that favors interpretations of statutes that avoid substantial constitutional questions. See, *e. g., United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408 (1909); *United States* v. *Jin Fuey Moy,* 241 U. S. 394 (1916); *Richmond Screw Anchor Co.* v. *United States,* 275 U. S. 331 (1928); *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932); *Screws* v. *United States,* 325 U. S. 91, 98 (1945). As originally stated, the proposition was that where a statute is "reasonably susceptible of two interpretations," the courts will choose the one that steers clear of collision with constitutional limitations. *United States ex rel. Attorney General* v. *Delaware & Hudson Co., supra,* at 407; *Texas* v. *Eastern Texas R. Co.,* 258 U. S. 204, 217 (1922). The principle is applied so as to preserve substantially the legislative purpose, even where a statute must be tailored to avoid a question of constitutional infirmity. See *Screws* v. *United States, supra; Crowell* v. *Benson, supra; FTC* v. *American Tobacco Co.,* 264 U. S. 298 (1924). In more recent applications, however, the Court has on occasion abandoned any fidelity to congressional intent in

order to avoid a constitutional question. See *United States* v. *Rumely,* 345 U. S. 41 (1953); *United States* v. *CIO,* 335 U. S. 106, 130 (1948) (Rutledge, J., concurring). In those cases, I believe, the Court engaged in a judicial rewriting of the relevant congressional Acts, and I concurred in the result only after reaching the constitutional questions the Court avoided. Today's decision, however, goes well beyond what was done in *Rumely* and *CIO.* In those cases, as in most that have applied the canon of construction, the Court has narrowed the congressional regulatory scheme in order to avoid confronting the possibility of overreaching. See *United States ex rel. Attorney General* v. *Delaware & Hudson Co., supra; United States* v. *Jin Fuey Moy, supra; Texas* v. *Eastern Texas R. Co., supra; FTC* v. *American Tobacco Co., supra; Blodgett* v. *Holden,* 275 U. S. 142, 148 (1927) (Holmes, J., concurring); *Missouri Pacific R. Co.* v. *Boone,* 270 U. S. 466 (1926). Today, however, the Court expands the opportunities for correcting unfairness in the congressional program, foisting upon Congress a device it never chose and indeed thought it had rejected. Today's holding thus represents a sheer *tour de force.* Cf. *United States* v. *Seeger,* 380 U. S. 163, 188 (1965) (DOUGLAS, J., concurring). This judicial legislation transgresses the bounds of our responsibility to avoid unnecessary constitutional questions. What Mr. Justice Cardozo said in *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373 (1933), bears repeating:

> " 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.' [Citation omitted.] But avoidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it . . . . The problem must be faced and answered." *Id.,* at 379.

See also *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515 (1964); *United States* v. *CIO, supra,* at 129–130 (Rutledge, J., concurring).

The drafters of the Rail Act wrote against a background of reorganization law, in which the Tucker Act has never before been regarded as a device for escaping constitutional questions. Challenges to bankruptcy legislation as permitting unconstitutional deprivations of property have occurred before. Our cases until today have faced these challenges without adverting to any Tucker Act remedy. See *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Corp.,* 294 U. S. 648 (1935); *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555 (1935); *Wright* v. *Vinton Branch,* 300 U. S. 440 (1937); *Ecker* v. *Western Pacific R. Co.,* 318 U. S. 448 (1943).[17] In construing the Rail Act to embrace a Tucker Act remedy, the Court disregards this tradition, and in this case opens up the possibility which Congress sought diligently to avoid—the imposition of a large financial burden upon the Treasury for the Conrail acquisition.

The Court of Claims is without power to enforce its judgments. While those amounting to less than $100,-000 are paid from a general appropriation, the payment of judgments exceeding this sum require special action by Congress. Ordinarily, of course, Congress pays these

---

[17] *Louisville Joint Stock Land Bank* v. *Radford,* held that the first Frazier-Lemke Act, which provided special relief to farm mortgagors in bankruptcy, was an unconstitutional taking of the mortgagee's security. Had the theory offered here by the Government been applied there, the Court could have avoided the issue by inferring a Tucker Act remedy. The possibility of such a course could not have escaped the Court's attention; *Hurley* v. *Kincaid,* 285 U. S. 95 (1932), had been decided just three years earlier, and Mr. Justice Brandeis, author of the *Radford* opinion, had written *Lynch* v. *United States,* 292 U. S. 571 (1934), only the previous Term.

judgments as a matter of routine. See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 570–571 (1962). But this is an exceptional case, involving the possibility of judgments in the billions of dollars.

The construction the Court gives the Rail Act today will amaze the legislators who drafted and voted for this statute. I cannot believe that Congress would have enacted this law had it been told that in the end it might have to dig into taxpayers' pockets not for the one billion appropriated but for unknown billions—perhaps 10 or 12 billion—for "just compensation" for property it authorized to be "taken."

### III

Article I, § 8, cl. 4, of the Constitution empowers Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States." This Court held many years back that that requirement required "geographical" uniformity. Its main purpose was to treat claimants against debtors the same in one area as in another. As stated by Mr. Justice Frankfurter, concurring in *Vanston Bondholders Protective Committee* v. *Green*, 329 U. S. 156, 172–173 (1946): [18]

> "The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits. See *Hanover National Bank* v. *Moyses*, 186 U. S. 181, 190. To estab-

---

[18] The requirement of "uniformity" does not preclude local variations that make rights of creditors or debtors depend on peculiarities of state law relating, *e. g.*, to dower exemptions, validity of mortgages, and the right to enforce through bankruptcy state remedies against fraudulent conveyances. *Stellwagen* v. *Clum*, 245 U. S. 605, 613–615 (1918); *Wright* v. *Vinton Branch*, 300 U. S. 440, 463 n. 7 (1937).

lish uniform laws of bankruptcy does not mean wiping out the differences among the forty-eight States in their laws governing commercial transactions. The Constitution did not intend that transactions that have different legal consequences because they took place in different States shall come out with the same result because they passed through a bankruptcy court. In the absence of bankruptcy such differences are the familiar results of a federal system having forty-eight diverse codes of local law. These differences inherent in our federal scheme the day before a bankruptcy are not wiped out or transmuted the day after."

The Solicitor General makes the curious argument that the Commerce Clause power which supports the continuance of this rail system requires no uniformity. But it is the bankruptcy power that gives Congress power to cut down on the obligation of contracts. Recourse to the Bankruptcy Clause is necessary to sustain this statute, for, as noted below, it authorizes significant impairment beyond that permitted under § 77.

The Act applies not across the Nation but only in the midwest and northeast region of the United States. Section 102 (13), 45 U. S. C. § 702 (13) (1970 ed., Supp. III), indeed so defines "region." It is to that "region" that USRA is confined by § 202 (b), 45 U. S. C. § 712 (b) (1970 ed., Supp. III), in the performance of its various duties. Reporting features of the Act reach only railroads in this "region." § 203 (a), 45 U. S. C. § 713 (a) (1970 ed., Supp. III). The Secretary of Transportation is likewise so confined. § 204 (a), 45 U. S. C. § 714 (a) (1970 ed., Supp. III). So is the new office—Rail Services Planning Office—in the Interstate Commerce Commission. §§ 205 (a), (d), 45 U. S. C. §§ 715 (a), (d) (1970 ed., Supp. III). The "final system plan" covers

only rail service in this "region." §§ 206 (a), (c), (d), 45 U. S. C. §§ 716 (a), (c), (d) (1970 ed., Supp. III). In short, the Act would have to be amended to make its procedure applicable to rail carriers not in the midwest and northeast region. The Solicitor General is therefore quite wrong when he says that the Rail Act applies with the same force and effect wherever railroad reorganizations are found.

The Special Court is a bankruptcy court, for Congress has given it "such powers" as "a reorganization court" has. § 209 (b), 45 U. S. C. § 719 (b) (1970 ed., Supp. III). And, "a railroad in reorganization" as defined in § 102 (12) includes those in § 77 of the Bankruptcy Act. That means that a railroad in § 77 proceedings but not located in the midwest and northeast region has more benign treatment than the six rail carriers before us in these cases. The importance of that difference is felt among the ranks of security holders: security holders of rail carriers who now or in the future are in a § 77 reorganization in the South or West will receive more considerate treatment than plaintiffs below in these cases. The differences are not minor but exceedingly substantial.

(1) Under § 77, as we held in the *New Haven Inclusion Cases, supra,* a plan was approved whereby the rail assets were disposed of with a view to reorganizing the remaining enterprise as an investment company. Under the Rail Act, § 207 (b) mandates a dismissal if "this chapter does not provide a process which would be fair and equitable to the estate of the railroad." 45 U. S. C. § 717 (b) (1970 ed., Supp. III). As the Reorganization Court held, the plan approved in the *New Haven Inclusion Cases* would not be permissible under the Rail Act, as the Rail Act nowhere envisages a bifurcated reorganization, one for nonrail assets and another for rail assets. The only choice is between an overall reorganization on

the one hand and a dismissal whereupon all the diversities of the old equity receivership can be explored. Thus, security holders of companies reorganized under the Act are deprived of advantages which security holders of other rail carriers in § 77 proceedings enjoy.

(2) In a sale or conveyance of assets pursuant to a plan under § 77, any lien on those assets is transferred to the proceeds. § 77 (o). But by reason of § 303 (b)(2) of the Rail Act the transfer is "free and clear of any liens or encumbrances."

(3) Under § 77 (d) *before* a plan can be consummated, the judge (as well as the Interstate Commerce Commission) must find it to be "fair and equitable." Under the Rail Act, § 303 (c), that finding is made only *ex post facto.* Thus the pressures are on to consummate the plan with no alternatives open to the Special Court except dismissal. The choice under § 77, which the *New Haven Inclusion Cases* illustrate, is barred; and the security holders here lack the benefit of the expertise of the Interstate Commerce Commission to which the courts give very great deference. See *Ecker* v. *Western Pacific R. Corp.,* 318 U. S. 448, 472–475 (1943). The *ex post facto* finding on the "fair and equitable" prerequisite of this plan robs these security holders of protective measures that security holders enjoy in reorganizations of rail carriers in other geographical areas.

(4) While the Rail Services Planning Office is directed to hold public hearings on the "preliminary system plan," § 207 (a)(2), it is USRA that prepares the final system plan, §§ 207 (c), (d), and submits it to the Congress. § 208. That submission to Congress is, however, perfunctory in the sense that the plan clears that hurdle *unless* Congress disapproves it. Under § 77 (e) the security holders ("all parties in interest") have a right to be heard before the court approves a plan. Under the

Rail Act no like hearing is granted. The denial of the right to be heard may at times amount to a denial of due process. I intimate no opinion on whether such a right could be constitutionally eliminated from all § 77 rail reorganizations.[19] But where the security holders of some rail carriers under § 77 are given that right and those who are claimants against plaintiffs below are denied it, that provision of this Rail Act obviously lacks that "uniformity" which the Constitution mandates.

While we have heretofore recognized that local variations by reason of state law governing the rights of creditors and debtors may be honored in bankruptcy without violating the uniformity clause,[20] we have never sanctioned a harsher bankruptcy procedure for the same class of debtors in one region than is applied to the same class in a different region. The bankruptcy court may, of course, be empowered to make its orders turn on the availability of credit which may be existent in one area but not in another.[21] But down to this day we have never dreamed of allowing debtors in the same class and their creditors to be treated more leniently in one region than in another.[22]

---

[19] Under § 77 (e) a two-thirds vote of each class of security holders affected by the plan is normally required. The bankruptcy court, however, may nevertheless approve the plan even though the two-thirds vote is lacking if it finds that the plan is fair and equitable and the rejection of it by a class of security holders "is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts." For an instance where we sustained a bankruptcy court in approving a plan that a class of security holders had rejected, see *RFC* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495, 531–535 (1946).

[20] N. 18, *supra.*

[21] *Wright* v. *Vinton Branch*, 300 U. S. 440 (1937).

[22] *Continental Illinois Nat. Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648 (1935), cited by the majority, *ante*, at 158–159, involved no question of geographical nonuniformity; § 77, upheld

My conclusion that this Rail Act does not have that "uniformity" required by Art. I, § 8, cl. 4, of the Constitution does not mean that it is unconstitutional in its entirety. It does mean, however, that the four ways in which "uniformity" is lacking must be remedied before the present group of security holders can be made to suffer both from § 207 (b) of the Act and from the cramdown provisions in § 303, including the absence of any meaningful right of the security holders to be heard on the fairness of a law.

We are urged to bow to the pressure of events and expedite in the public interest the reorganization of these six rail carriers. An emergency often gives Congress the occasion to act. But I know of no emergency that permits it to disregard the Just Compensation Clause of the Fifth Amendment or the uniformity requirement of the Bankruptcy Clause of the Constitution.

I fear that the "hydraulic pressure" generated by this case will have a serious impact on a historic area of the law, jealously protected over the centuries by courts of equity in the interests of justice.

---

in that case, adopted special procedures for all railroad bankruptcies. Similarly inapposite are the *Head Money Cases,* 112 U. S. 580 (1884), which involved the uniformity requirement of Art. I, § 8, cl. 1. Although the head tax classified persons by citizenship and mode of entry, it applied "alike in every port of the United States where such passengers can be landed." *Id.,* at 594.